THE HONORABLE JAMES L. ROBART

—— FILED          —— ENTERED
—— LODGED        —— RECEIVED

DEC 2 3 2010   JS

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

**08-CV-01827-DECL**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LONDI K. LINDELL<br><br>Plaintiff,<br><br>v.<br><br>CITY OF MERCER ISLAND, a Washington municipal corporation; MERCER ISLAND CITY MANAGER RICHARD CONRAD, in his official and individual capacities; MERCER ISLAND DEPUTY MAYOR JIM PEARMAN, in his official and individual capacities; MERCER ISLAND COUNCILMEMBER ERNEST JAHNCKE, in his official and individual capacities; MERCER ISLAND FINANCE DIRECTOR CHARLES CORDER, in his official and individual capacities,<br><br>Defendants. | No. CV 08-1827 JLR<br><br>DECLARATION OF IRA B. APPELMAN SUPPORTING REPLY IN SUPPORT OF MOTION TO QUASH<br><br>NOTE ON MOTION CALENDAR: December 24, 2010 |

DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 0

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

Ira B. Appelman declares and states as follows:

1.      I am over the age of eighteen, am competent to testify, and have personal knowledge of the matters contained herein.

2.      I am a researcher by training and temperament.  In 1967, as a junior at Mercer Island High School, I began using the University of Washington main Suzzallo Library and the law library at Condon Hall to research the national high school debate topic.  Later I graduated Phi Beta Kappa and Magna Cum Laude from the UW with a B.S. in Psychology with distinction and a B.A. in Philosophy with college honors.  I received a National Science Fellowship which I used at Stanford University to earn a Ph.D. in Psychology, a research degree.  I later was co-principal investigator for a National Science Foundation research grant at Loyola University of Chicago.  Next I worked as a research scientist and branch chief in the Office of Research and Development at the Central Intelligence Agency in Washington, D.C.  I have done local financial and educational research with my company, Appelman Research.

3.      Between February and May 2009, I disseminated materials on the cover-up at City Hall related to the Lindell lawsuit.  In a previous declaration, I introduced into evidence the purported Lindell Claim for Damages Form with attachment that was included in that dissemination. Dkt 242-2, Exh. H.   Defendant City of Mercer Island et al. has identified the Claim for Damages Form with attachment that I disseminated as "Ms. Lindell's tort claim form," Dkt 247, p. 2, lines 9-17.  On September 15, 2010, I made a public records request of the City of Mercer Island for the Lindell Claim for Damages Form with attachment, which the City provided as a heavily blacked out (redacted) document

DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 1

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

claiming attorney-client privilege.  In a previous declaration, I introduced into evidence the highly redacted Lindell Claim for Damages Form with attachment. Dkt. 242-2, Exh. J. Comparing the unredacted Lindell Claim for Damages attachment with the City's redacted version, I created Exhibit L, which is a true and correct copy of the redactions made by the City of Mercer Island as attorney-client privileged.

4.      The attachment to Lindell's Claim for Damages Form contains twenty-eight paragraphs of narrative.  The City of Mercer Island claims that all paragraphs, but the first eleventh, and twenty-eighth, contain attorney-client privileged information.  Some of the paragraphs are entirely or substantially redacted (paragraphs 2-10, 12-15, and 17) and the rest are only partially redacted. In Exhibit L, the paragraphs are numbered from 1 to 28.

5.      Paragraph 2 contains general information about the City Clerk Tina Eggers sexual harassment claim against City Manager Rich Conrad.  In response to my public record requests of the City of Mercer Island in 2005 (Dkt. 34 Exh. 1; Dkt 37 at 3, Dkt 49 at 6), I received all the information in paragraph 2 including the following and many more documents:  Exhibit M is a true and correct copy of the redacted Conrad disciplinary memo that explains most aspects of the sexual harassment complaint (Dkt. 48-2, Exh I is the unredacted version). I included this memo with all my 2009 disseminations. Exhibit N is a true and correct copy of the bill of Amy Stephson, who investigated the Conrad/Eggers matter. Exhibit O is a true and correct copy of the bill of Judicial Dispute Resolution, LLC that mediated the Conrad/Eggers matter.  Exhibit P is a true and correct copy of the redacted $90,000 check to Eggers. Despite the redactions, I knew the employee was Tina Eggers because I was given the settlement agreement for the employee who filed a sexual

DECLARATION OF IRA B. APPELMAN                          Ira B. Appelman
SUPPORTING REPLY IN SUPPORT OF                          6213 83rd Place S.E.
MOTION TO QUASH                                         Mercer Island, WA 98040
(Cause No. CV 08-1827 JLR) Page 2                       (206) 232-5411

1  harassment complaint against Conrad; I made another public records request asking for any

2  settlement agreement given to Tina Eggers, which turned out to be identical to the previous

3
4  settlement agreement.  Exhibit Q is a true and correct copy of then City Attorney Lindell

5  explaining to me that the settlement agreements were identical.

6      6.      The other redacted paragraphs, three to ten and twelve to twenty-seven,

7  concern the Segle matter, which was investigated by Marcella Reed.  This Court found that

8
9  documents concerning the discipline of John Segle and subsequent investigation were not

10  attorney-client privileged (Dkt. #182) because the Mercer Island City Council had waived

11  privilege (Dkt. 179).  I had hoped to do the same thing for the Segle/Reed redacted

12  paragraphs as I have done for the Eggers paragraph, i.e. show that each paragraph

13
14  corresponds to non-privileges documents available from the City, but the City through its

15  attorneys has frustrated my efforts to get non-privileged documents as I describe infra 7-10.

16  I believe this Court is so familiar with these matters,that it can easily determine whether

17  there is anything confidential/privileged in the redactions by simply reading Exhibit L.

18
19      7.      I believe I qualify as an expert (not legal expert) in public record requesting

20  in Washington State.  Over the past nearly 14 years, I have made well over a hundred

21  public record requests under the previous Public Disclosure Act (RCW 42.17) and the

22  recodified Public Records Act (RCW 42.56).  I have purchased and read the Washington

23
24  State Bar Association Public Records Act Deskbook (2006) and have read numerous WA

25  Supreme Court and appellate court  public records act decisions.  The bulk of my record

26  requests have been made of the City of Mercer Island.  I have also requested records from

27  King County, Sound Transit, the Puget Sound Regional Council (PSRC), the Washington

28  DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 3

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

1

2

3

4

5

6

7

8

9

Cities Insurance Authority (WCIA), King County Libraries, and the following cities: Bellevue, Bellingham, Carnation, Cle Elum, Covington, Des Moines, Duvall, Edmonds, Everett, Federal Way, Issaquah, North Bend, Oak Harbor, Kelso, Kenmore, Kennewick, Kirkland, Lacey, Lake Forest Park, Lakewood, Lynnwood, Maple Valley, Mill Creek, Monroe, Moses Lake, Mountlake Terrace, Mount Vernon, Mukilteo, Olympia, Pasco, Redmond, Seatac, Snoqualmie, Spokane, Tukwila, Walla Walla, Wenatchee, Woodinville, Yakima and probably others.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

8.  In all my public record requests, I have never met anyone more disruptive, less knowledgeable, and less compliant than Michael & Alexander.  By way of background, the City et al. claimed to have given Ms. Lindell "over 23,000 pages" of documents in response to her record requests (Dkt. 43, p. 2 line 1 & footnote 1), so I requested those records of the City of Mercer Island.  They forced me to review the records at the law offices of Michael and Alexander.  The public records act requires that the records "shall be available for inspection and copying during the customary office hours of the agency," (RCW 42.56.090), that is, the customary office hours of the City of Mercer Island.  Michael & Alexander provided all sorts of excuses for limiting the inspection time of the records – they claimed they are a small law firm and don't have space available, then they claimed they don't have an attorney on the case available to supervise my inspection.  When I complained to Stephanie Alexander that they weren't complying with the act, I was told, "I don't want to argue with you."  These excuses substantially interfered with my inspection of the records, but that is only background for what happened next.

28

DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 4

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

9. On August 11, 2010, I requested records including "the Marcella Reed report (or records indicating results or conclusions) and any other related records based on the 2007 investigation into the propriety of the relationship between City Manager Conrad and Human Resources Director Kryss Segle." As required by law, one week later, I received the City of Mercer Island's boilerplate answer that they needed an additional 60 business days (three months!) to "locate and assemble the requested records and determine whether any information in the responsive records is exempt." Exhibit R is a true and correct copy of the response from City Clerk Spietz. I believe three months is unreasonable and so informed Clerk Spietz in a telephone conversation, but since my only alternative is to file suit in Superior Court, I waited the three months. In my experience, it is the City Attorney that runs the record request responses (and ultimately the City Manager), not the City Clerk, who merely coordinates the response. I have around seven years of experience working smoothly with Clerk Spietz. On November 11, 2010 (three months later) I received an email from the City Clerk claiming another ten days were required. Exhibit S is a true and correct copy of the additional ten day notice. On November 16, 2010, the City responded that the records were at "the law firm of Michael & Alexander" and gave me three options. I could (1) contact Michael and Alexander to review the records; (2) wait until the litigation concluded and the records were returned to the City Clerk; or (3) pay for copying the records. The last full paragraph begins, "Please respond letting me [Spietz] know which option you prefer." The last line of the email reads, "If you have any questions, please contact me directly..." These are standard statements from Clerk Spietz and are important because of what Michael and Alexander would falsely claim later. Exhibit T is a true and

DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 5

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

1  correct copy of the email from Clerk Spietz indicating that the records are now available

2  and (as usual) I should contact her.  As is the custom, I both called and emailed Clerk

3
4  Spietz.  I asked how many pages of records needed to be copied.  I was having such a bad

5  experience with Michael & Alexander on the first record request, I was looking for a way to

6  avoid them.  However, since in my experience responses to record requests often contain

7
8  many duplicates of email as they are forwarded to many people, I wanted to know the cost

9  before the records were copied.  Exhibit U is a true and correct copy of my email to the City

10  Clerk requesting the number of copies so I could determine the cost.  City Clerk Spietz told

11  me in my phone conversation that she would contact Michael & Alexander to determine the

12  number of responsive records.

13
14      10.  Exhibit V is a true and correct copy of an email letter I received the next day

15  from Thomas Holt, an attorney with Michael & Alexander.  Mr. Holt first falsely claims

16  that I had "repeatedly telephoned" Clerk Spietz (first paragraph, last sentence).  Then Mr.

17  Holt falsely claims that I had been "repeatedly asked to directly correspondence" to them.

18
19  In fact, Exhibit X shows I was instructed to contact Clerk Spietz. **BUT THE SHOCKING**

20  **ANSWER IS THAT MR. HOLT DOES NOT KNOW HOW MANY PAGES ARE**

21  **RESPONSIVE TO MY PUBLIC RECORDS REQUEST BECAUSE THEY HAVE**

22  **NOT "LOCATED AND ASSEMBLED" ANY RECORDS AT ALL!** In the more than

23
24  three months they said they needed to fulfill my record request, they have done NOTHING.

25  Now, Mr. Holt is asking me to clarify my request, which was supposed to be done when

26  they acknowledged my request, before they estimated how long it would take to respond to

27  the request. (RCW 42.56.520 "In acknowledging receipt of a public record request that is

28  DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 6

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

1   unclear, an agency... may ask the requestor to clarify what information the requestor is

2   seeking.).  **In my fourteen years of experience making record requests, I have never**

3   **experienced anything close to this lack of compliance.**

4

5        11.     In 2001, I founded the Mercer Island Community Council (MICC), a

6   Washington Non-Profit Corporation, using a Bellevue law firm to make sure it was

7   properly filed with the WA Secretary of State.  When I began getting involved in local

8   government in 1997, I printed thousands of footnoted articles on my Macintosh LC III

9   home computer.   I disseminated them by walking throughout the neighborhoods and

10  leaving them under the front doormat of thousands of homes.  On flat land, I could deliver

11

12  up to seventy-five houses per hour for a maximum of four hours, or to 300 houses before

13  limping home.  Exhibit W is a true and correct copy of an article I disseminated in January

14  of 1998. Mercer Island has large flat areas, but as the land slopes to Lake Washington it

15  gets very steep making it very difficult to deliver articles on foot.   During this period,

16  Islanders sometimes offered to help pay for the printing of the articles, but I was

17

18  uncomfortable putting checks for that purpose in my personal bank account.

19

20       12. With the MICC, I collected money by including return envelopes and a request

21  for funds.  Voluntary contributions paid for additional mailings.  Postage and printing are

22  very expensive. I have never received any salary or compensation for my time from the

23  MICC.   Since 2001, I have voluntarily chosen to file financial reports with the Public

24

25  Disclosure Commission ("PDC"), King County Elections, and the City of Mercer Island

26  concerning the activities of the MICC.  Thus, during the 2009 dissemination including the

27  Lindell Claim, I filed PDC Form C3s and C4s, which showed consistent with PDC

28  DECLARATION OF IRA B. APPELMAN                          Ira B. Appelman
    SUPPORTING REPLY IN SUPPORT OF                         6213 83rd Place S.E.
    MOTION TO QUASH                                        Mercer Island, WA 98040
    (Cause No. CV 08-1827 JLR) Page 7                      (206) 232-5411

requirements the contributors to the MICC and how funds were spent.  These filings were likely not required because there is no candidate or ballot issue.  I have been to every City Council meeting on Mercer Island since April 21, 1997, and I have received the Key Award from the statewide Washington Coalition for Open Government for using the Public Records Act to gather and disseminate information.

13.  My activities have garnered resentment from those running the City.  I am currently investigating Mayor Jim Pearman using the Public Records Act on an unrelated matter, which I won't describe here because he is a party in the Lindell suit.  Mayor Pearman hasn't spoken to me in years though he lives three blocks away and I see him at the council meetings all the time.  On December 17, 2003, Pearman and another council member, Dan Grausz, attacked me in the Mercer Island Reporter with an article entitled, "Disinformation undermines community."  Exhibit X is a true and correct copy of that article.  I have studied back issues of the local newspaper, and this is the first instance in memory where council members have ganged up to attack a citizen.  I was allowed to reply two weeks later on December 31, 2003 with an article entitled, "Open discussion builds community."  Exhibit Y is a true and correct copy of that article.

14. When I began my 2009 disseminations with the MICC related to the Lindell suit in February, the City's lawyers immediately began to investigate the MICC.  Exhibit Z is a true and correct copy of a March 4, 2009 receipt from Stephanie Alexander requesting MICC Annual Reports from the WA Secretary of State that I received on record request from the City.  On April 22, 2009, the Mercer Island Reporter attacked my mailings in three articles in one issue.  Exhibit AA is a true and correct copy of the article, "Letter to

DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 8

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

Islanders accuses city of secrecy, misconduct." This is a subtle attack. The article first summarizes my mailing, but then provides the "unvarnished view of the situation." Exhibit BB is a true and correct copy of the second article, "What is the 'Mercer Island Community Council?'" This article blames me for using 25% of the City's record request budget. Exhibit CC is a true and correct copy of an editorial article entitled, "Motives for mailings." According to this article, Lindell is behind my writings. Her use of "privileged and protected" communications is helping me "sow mistrust and animosity…" It turns out the City was happy to help the Reporter with its articles. Exhibit DD is a true and correct copy of an email to the Reporter passing on information about the MICC "that Katie asked I send to you," apparently without the need for a formal record request. Exhibit EE is an email to the Reporter providing an Excel spread sheet showing the time it takes to do the record requests. As the email states in paragraph, the "Public Records Act does not require the City to create documents" but Clerk Spietz "created these documents as a courtesy to help you obtain the information you are looking for."

15. In June 2009, after I had completed the mailings, I filed for the City Council election on the last day for filing, Friday, June 5th. No one including me expected me to file. Exhibit GG is a true and correct copy of an article published by the Reporter entitled, "Election filing surprises for City Council/ Appelman to run against Grausz." The Lindell suit played no part in the election since Grausz is not a named party. The MICC was dormant during my campaign. My campaign committee was "Ira for Council." Grausz is a bad actor who along with Pearman wrote the article attacking me in 2003. On the last day for filing he was unopposed, so I filed. At that point, I had no campaign committee or

DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 9

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

anyone lined up to help me.  Exhibit FF is a true and correct black and white copy of my last campaign mailing listing the issues of importance to me.  The Lindell suit played little or no part in the campaign.

16.  I am currently disseminating to Islanders the Sterbank Memo, the Lindell video case summary (Dkt 207) and a two-page article describing the continuing cover-up of misconduct and alleged misconduct at City Hall.  Exhibit HH is a true and correct copy of the latest version of the two-page article.


I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

Dated this 23rd day of December, 2010 at Mercer Island, Washington.


Ira B. Appelman

DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 10

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

# DECLARATION OF SERVICE

The undersigned hereby declares under penalty of perjury under the laws of the State of Washington that, on the below date, I delivered or caused delivery of a true copy of this document to the following persons:

Michael & Alexander, PLLC
One Convention Place
701 Pike Street, Suite 1150
Seattle, WA  98101
Stephanie R. Alexander, Esq.
Suzanne K. Michael, Esq.
Thomas P. Holt, Esq.
*Attorneys for Defendants*
at their regular offices.

The Blankenship Law Firm, P.S.
1201 Third Avenue, Suite 2880
Seattle, WA 98101
Scott Blankenship. Esq.
Nazik Youssef, Esq.
*Attorneys for Plaintiff*
at their regular offices.

The Allied Law Group
2200 Sixth Avenue, Suite 770
Seattle, WA
Michele Earl-Hubbard, Esq.
*Attorney for Marty Gale*
at her regular offices.

DATED this 23rd day of December, 2010, at Mercer Island, Washington.

Ira B. Appelman, Pro Se
6213 83rd Place S.E.
Mercer Island, WA  98040-4915
Telephone: (206)232-5411
Email: appelman@bmi.net

DECLARATION OF IRA B. APPELMAN
SUPPORTING REPLY IN SUPPORT OF
MOTION TO QUASH
(Cause No. CV 08-1827 JLR) Page 11

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
(206) 232-5411

# Exhibit L

**City of Mercer Island's attorney-client privilege redactions for paragraphs 1 to 28 of the narrative portion of Lindell's Claim for Damages Form attachment**

1. No redactions
2. By way of background, in 2003 I defended the City against a sexual harassment claim filed by a City employee, who had alleged that City Manager Conrad requested sexual relations with her and retaliated against her when she refused him. The matter was investigated by an independent investigator. The City consulted with an outside attorney. The matter was mediated and resulted in the employee leaving the City and being paid a substantial amount of money. As a result, Conrad was disciplined. He was suspended without pay for two weeks (one week stayed), denied a raise for the following year, and ordered to take sexual and anti-harassment training.
3. In addition to Conrad being disciplined, then Human Resource Manager Kryss Segle was also disciplined for her involvement in the matter. The employee had complained to Segle about Conrad's request for sex and subsequent retaliation, but Segle had failed to conduct an investigation into the matter as required by the City's Employee Handbook, and as necessary to create an affirmative defense for the City.
4. When Conrad promoted Ms. Segle to Human Resource Manager in approximately 2000, she was directed not to be involved in any personnel or employment matter where she would have a conflict of interest due to her husband's employment at the City. Nevertheless, Mr. Segle was recently disciplined ( a very minor form of discipline—a written warning) and contrary to the directive not to be involved, Ms. Segle rallied directly and affirmatively on behalf of her husband. Notwithstanding her position as Human Resources Director of the City, ( a role in which she should be administering discipline and advocating the City's position) she drafted *for* Mr. Segle and the union a very lengthy and detailed grievance asserting a number of factual and contractual defenses *against* the City.
5. Subsequent to submission of the grievance, Ms. Segle also met privately with Conrad on several occasions. During those meetings she informed him that she would resign if he did not ensure that Mr. Segle's discipline would be rescinded and removed from his personnel file.
6. Conrad initially responded to Mr. Segle's importuning by in fact intervening in the grievance process and telling Mr. Segle that he would rip up the discipline if Mr. Segle would rip up his grievance. Former City Attorney Bob Sterbank learned of this action and wrote a memo to Conrad.
7. Sterbank had expressed to me and others concern about the nature of the relationship between Conrad and Ms. Segle. Ms Segle and Conrad were seen meeting at restaurants and bars both during and after work hours, and Sterbank and others saw a similarity between the relationships Conrad had with the former employee who filed a claim in 2003, and Ms. Segle. Sterbank was concerned that the nature of the relationship, and some of Ms. Segle's behavior on the job, created, if nothing else, an appearance of impropriety that could have significant legal consequences to the City. Conrad made numerous remarks to me, Sterbank and other City employees about his relationship with Ms. Segle, stating that, for example, he had a special

connection with Ms. Segle, that their relationship could be compared to a marital relationship, that he would quit if Ms. Segle resigned and the main reason he wanted to get up in the morning was so that he could come to work and see Ms. Segle. These kinds of incidents and remarks suggested to Sterbank that the potential for another claim against Conrad and the City existed and needed to be addressed.

8. Following receipt of the memo from Sterbank, Conrad became livid and advised Assistant City Manager/Parks & Recreation Director Pete Mayer and me that Sterbank must be fired. I advised Conrad that doing so would likely be perceived as retaliatory, and would further expose the City. Conrad then asked Sterbank to amend his memo, based only upon Conrad's assertions that there was nothing really to be concerned about. Sterbank rejected the request.

9. Conrad then asked me on several occasions to get Sterbank to revise his legal opinion. I refused those requests. Conrad then asked me and Mayer to perform truncated investigations into the issues raised in Sterbank's memo for the purpose of clearing Conrad's name. Conrad proposed drafting the questions himself, sitting in the room during questioning of the witnesses, only talking to three directors, prohibiting review of emails, and other procedural steps that were not likely to lead to an untainted result. When Mayer and I refused to be part of such a process, Conrad wrote: "I can't trust my top advisers" and "When are you guys going to let me lead my City?"

10. Frustrated, Conrad then set up a full day facilitated discussion with one of his colleagues, former City Manager Anne Pflug. The purpose of this discussion was to achieve Conrad's desire to have "his name cleared." I sent an email to Conrad and others indicating my objective from this facilitated discussion was to resolve the management issues arising from the Segle discipline matter so the organization could move forward. My email clearly stated my objective was not to commence an investigation by a third party. Pflug interviewed Kryss Segle, Maintenance Director Boettcher, Conrad and Sterbank. Pflug then advised Sterbank, me, Mayer and Conrad that in order to be effective, the City really needed an investigation by an outside neutral third party. Conrad agreed to Pflug's proposed investigation. ....was a decision sought by Conrad in order to clear his own name,,,

11. No redactions

12. The City retained Marcella Reed to perform the independent investigation into Conrad's relationship with Ms. Segle. Conrad refused to allow City Attorney Sterbank to act as legal counsel for the City so the City was required to retain Mike Bolasina, outside legal counsel. The parties all agreed that they would not discuss with each other the subject matter of the investigation and it would all remain confidential pending completion of the investigation. Conrad was specifically directed by Mike B olasina not to discuss the investigation with witnesses and not to retaliate against anyone as a result of the investigation.

13. Almost immediately upon commencement of the investigation, in November of 2007, and in violation of the City's legal counsel's directive, Conrad began meeting individually with Council members to disparage and retaliate against me and Sterbank. Initially, Conrad alleged that he had done nothing wrong, that Sterbank was a poor performer and a bad organizational fit, and that Sterbank was using his memo to protect himself from getting fired. Later, when Conrad learned that my testimony to the investigator was potentially damaging to his case, he alleged I

2

was conspiring to get him fired so I could have his job. Conrad also had numerous meetings with Police Chief Ed Holmes, Finance Director Chip Corder, Kryss Segle, and Assistant City Attorney Katie Knight, for the purpose of influencing their testimony to Ms. Reed, convincing them his relationship with Ms. Segle was merely professional, and disparaging Sterbank and me.

14. Also during this November and December 2007 time frame, Conrad had been lobbying me to support him when I was interviewed by Marcella Reed. He repeatedly placed me in an awkward position by raising issues relating to the investigation and demanding that I report things to Reed in a certain way so that he "can trust" me. When I responded that I would tell the truth and would not put a "spin" one way or the other on the questions posed to me, Conrad stated "that might not be good enough." Conrad also told me repeatedly that I "was the key" to his name clearing and suggested that if I didn't contact the City Council and advise them he had done nothing wrong, my silence would act as an indictment of him. I reminded Conrad that outside legal counsel had directed us not to improperly interfere with the Reed investigation and accordingly, I would not lobby City Council members.

15. Ms. Reed, an experienced third party investigator, had commenced a detailed and professional investigation into the allegation that Conrad's conduct violated the City's anti-harassment policy and other applicable law. Ms. Reed briefed the City Council in executive session on December 3, 2007, just prior to the completion of her investigation. Then-Mayor Cairns had warned City Council members prior to this executive session that Ms. Reed would be providing them a status report on the investigation and that "things weren't looking good for the City Manager, and the Council may wish to discuss options."

16. ...Council abruptly aborted the investigation and told Ms. Reed that her services were no longer required....assuming responsibility for completing the investigation......issues related to sexual harassment...from Conrad's and Kryss Segle's misconduct...

17. ...unencumbered by the written findings of the independent investigator, the three Council members reported their new findings to the full City Council and concluded that Sterbank wrote the legal memo only because he was having performance issues, and that I improperly pushed for the investigation because I wanted Conrad's job. The decision to retain an outside third party investigator and attorney.... by Pflug prior to Pflug's unsolicited recommendation that a full and independent investigation be conducted.

18. ...investigator Reed's work....no wrongdoing by Conrad and Segle.

19. ...into Conrad's alleged misconduct...

20. ....into the conduct of Conrad and Segle....it was Conrad himself who mandated that there be an investigation.....in drafting Sterbank's memo...

21. ...into whether Conrad had an inappropriate relationship with Ms. Segle....These are the issues that were investigated by Marcella Reed.

22. ...Conrad, who overheard all or most of these remarks, never counseled Jahncke about their impropriety (other than when Jahncke sent an email to Conrad and certain male department directors showing a video regarding men that can only stare at women's breasts when they are speaking to woman).

23. ...Marcella Reed's independent investigation ...

3

24. The parties had been directed by legal counsel not to have any contact about the investigation while it was being conducted. Yet, Corder and Conrad met to discuss exactly that matter.....Conrad and Corder fabricated facts to convince the City Council and other witnesses that I had entrapped Conrad and Segle into engaging in their respective misconduct, and that my ultimate goal was to be promoted to City Manager after Conrad was fired....the Council ultimately adopted this theory and ran with it.

25. ...who later took over the investigation...and the subsequent Sterbank memo...

26. ...The real purpose was to discuss an investigation into potential misconduct by the City Manager... "complaints or charges brought against a public...employee" per RCW 42.30.110(1)(f)... performance and discipline of a public employee per RCW 42.30.110(1)(g)...the investigation into possible City Manager misconduct...by deciding to terminate Marcella Reed's services; take over the investigation; terminate myself and the City Attorney; approve a separation agreement with Sterbank; and determine the appropriate discipline for Conrad's misconduct...

27. ...with a personnel investigation into whether the City Manager's conduct created a hostile work environment or were created in connection with disciplining the City Manager or Kryss Segle in connection with such misconduct.

28. No redactions

# Exhibit M



# *Memorandum*

## *City Council*

Date:      October 16, 2003

To:        Richard M. Conrad, City Manager

From:      Alan R. Merkle, Mayor

RE:        Harassment Complaint

---

## Complaint

On September 26, 2003, Deputy City Manager Deb Symmonds and City Attorney Londi Lindell received a sexual harassment complaint from a female City employee ("Complainant"), through her legal counsel, alleging that you had engaged in *quid pro quo* sexual harassment and that your conduct had created a hostile work environment.

*Quid pro quo* harassment occurs when a supervisor offers some tangible benefit or threatens some tangible harm in return for sexual favors. A hostile work environment is created when four factors exist: (1) the conduct is unwelcome; (2) the employee would not have suffered the harassment if she had been of a different sex; (3) the harassment was sufficiently pervasive to alter the conditions of employment and create an abusive work environment; and (4) the harassment is attributable to the employer.

The City of Mercer Island anti harassment policy, a copy of which is attached as Exhibit "A" ("Policy"), prohibits any harassment of employees and authorizes the City Attorney's Office to direct an investigation into any harassment complaint.

Upon receipt of the complaint, the Deputy City Manager immediately assumed responsibility from you for supervising the Complainant. The Deputy City Manager also assumed the role of "Acting City Manager" for purposes of managing the investigation of this complaint. You were directed to avoid all contact with the Complainant during this investigation.

## Investigation

Consistent with the Policy, the City Attorney immediately commenced an investigation into this complaint. On September 26, 2003, the City retained an independent investigator and lawyer, Amy Stephson, to perform the investigation. Ms. Stephson interviewed the Complainant, you and all appropriate witnesses. In response to the Complainant's request that you be immediately placed on administrative leave, you

were directed to telecommute from your residence and not be on City Hall premises during normal working hours until this investigation was concluded. Ms. Stephson completed an investigative report, dated October 15, 2003 ("Report").

A review of the Report together with legal advice, leads to the conclusion that you have not engaged in *quid pro quo* sexual harassment and that your conduct has not created a hostile work environment. However, it also leads to the conclusion that your conduct was inconsistent with the Policy, which sets a stricter standard and provides in pertinent part, as follows:

> City policy *also* prohibits ... *"behavior that interferes with a positive work environment"* (emphasis added)

Your conduct described in the Report did interfere with a positive work environment between you and the Complainant. As City Manager, you are expected to not only adhere to all City policies, but that you will be an exemplary model of professionalism for your staff. Your decision to enter into and maintain a nonprofessional, personal relationship with the Complainant constitutes poor judgment. Your decision not to immediately advise the City Attorney of your actions that lead to the complaint was also poor judgment.

## Discipline

The City Council previously delegated authority to me to manage your employment relationship with the City and I have done so for the last several years.

I have consulted with the City Council and with its concurrence, have concluded you will be disciplined for your actions as follows:

## Suspension

(1)   Two weeks' suspension without pay to commence immediately on Friday, October 17, 2003;

(2)   One week of the two-week suspension without pay will be stayed conditioned upon you obeying all City rules, and not being disciplined for any other matter for a period of one (1) year; and

(3)   You may not use sick leave, vacation, holiday or compensatory time to satisfy this suspension.

## Future Contact with Complainant

(1)

(2)

(3)

(4)

(5)     You are prohibited from taking any action that constitutes retaliation against the Complainant.

(6)     Your ongoing relationship with the Complainant will be monitored by both Ms. Symmonds, as her supervisor, and me, as your supervisor, to confirm you are complying with the foregoing restrictions on future contact with the Complainant.

Other Discipline

(1)     For the year 2003, you will not receive a salary increase to your base 2002 salary compensation;

(2)     For a period of one year, any overnight travel by you on behalf of the City must be approved by me as to both the purpose of the conference and any additional City employee attendees; and

(3)     You will immediately undertake sexual and anti-harassment training.

Obviously, this is a serious and unfortunate matter. Your performance as City Manager in all other respects has been exemplary, and you are highly regarded by City employees, administrators, managers and elected officials throughout the region. However, this type of conduct will not be tolerated or permitted, notwithstanding your other contributions.

Accordingly, you are urged to take this matter seriously and take all necessary steps to prevent further occurrences. Any further conduct of a similar nature could result in termination of your employment.

cc:     Mercer Island City Council

# Exhibit N

# Amy J. Stephson
**ATTORNEY AT LAW**

Phone: (206) 223-7215
Fax: (206) 223-7798
E-mail: amystep@aol.com

Date:  October 21, 2003

To:  City Attorney Londi K. Lindell
City of Mercer Island
9611 S.E. 36th Street
Mercer Island, WA  98040-3732

**RECEIVED**

OCT 2 3 2003

MERCER ISLAND
CITY ATTORNEY

## Invoice

Re:  Investigative Services for City Attorney

Fee and Expenses:  $10,440

Thank you.

Amy J. Stephson

# Exhibit O

☑003/005

*To Nickie*
*10/24/03*
*as backup for*
*E W Reg.*

**Judicial Dispute Resolution, LLC**

Tax ID #91-1825903

Invoice Number        13814
Invoice Date          10/24/2003

Londi Lindell
City Attorney
9611 SE 36th
Mercer Island, WA 98040

Charles S. Burdell, Jr.
JoAnne L. Tompkins
Terrance A. Carroll
Rosselle Pekelis
George Finkle
Larry Jordan
R. Joseph Wesley

Jack G. Rosenow

Regarding:

Rosselle Pekelis

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Mediation on 10/27/03 at 8:30 a.m. | 7.00 | 380.00 | 2,660.00 |
| Preparation time | 1.00 | 380.00 | 380.00 |
| Administrative Fee | 0.00 | 0.00 | 250.00 |
| | | | 3,290.00 |
| **YOUR PORTION** | | | 3,290.00 |

Due Upon Receipt

*Pd 10/24/03*
*Warrant # 00093674*

**Return Remittance**
**Please return this portion with your payment - Thank you!**

Londi Lindell

Invoice Number:         13814
Balance Due:            3290.00

Amount Enclosed:        _____

1411 Fourth Avenue, Suite 200
Seattle, WA 98101
Phone: (206) 223-1669
Fax: (206) 223-0450
www.jdrllc.com

# Exhibit P

067631

| Description | From Date | To Date | Invoice # | Invoice Amt | Amou |
|---|---|---|---|---|---|
| Indemnity | | | | $90,000.00 | $90,000. |

Claim Number: GC021780    Claimant: ███    Payee: Magladry Weigel, P.S. and ███
Check Number: 67631    Event Date: 6/19/2002    Department: MI Mercer Island
Memo: full & final settlement

REMITTANCE STATEMENT - PLEASE DETACH BEFORE DEPOSITING

DO NOT ACCEPT THIS CHECK UNLESS THE PINK LOCK & KEY ICONS FADE WHEN WARMED AND YOU CAN SEE A PENTAGON-SHAPED TRUE WATERMARK WHEN HOLDING THE CHECK TO THE LIGHT

**Washington Cities
Insurance Authority**
P.O. BOX 1165
RENTON, WA 98057

BANK OF AMERICA
SOUTH CENTER BRANCH
P.O. BOX 88199
TUKWILA, WA 98188

19-2
250

067631

| DATE | CHECK NO. |
|---|---|
| 11/12/2003 | 67631 |
| AMOUNT | |
| | $90,000.00 |

PAY  Ninety thousand and 00/100 Dollars ************************

TO
THE
ORDER
OF    Magladry Weigel, P.S. and ███

full & final settlement

OVER $35,000 TREASURER OR PRESIDENT MUST ENDORSE

⑆067631⑆ ⑈125000024⑈ 63213 714⑈

# Exhibit Q



**OFFICE OF THE CITY ATTORNEY**
9611 S.E. 36th Street • Mercer Island, WA 98040-3732
(206) 236-3571 • FAX: (206) 236-3651
www.ci.mercer-island.wa.us

October 25, 2005

Ira B. Appelman
6213 83rd Place SE
Mercer Island, WA 98040-4915

Re: Public Records Act Request

Dear Mr. Appelman:

In response to your recent phone request regarding the City's October 14, 2005 Response to your Request for Access to Public Records dated September 9, 2005, we are providing you another redacted copy of the Settlement and Release Agreement dated October 27, 2003, which document was listed as Item No. 1 in the City's October 14, 2005 Response. As indicated in that letter, we had previously provided this document to you. The reasons listed in our September 2, 2005 Response to your August 15, 2005 Public Records Request for redacting this document remain the same in forwarding this document to you again.

Should you have any additional questions, please do not hesitate to contact me.

Sincerely,

*Londi K. Lindell /enr*

Londi K. Lindell
City Attorney

Enclosure: Redacted Settlement Agreement

C:     City Clerk



Telecommunications Device
for the Deaf (206) 232-9598



Printed on Recycled Paper

# Exhibit R

**Subject: Request for Public Records No. 10-411**
**Date:** Wednesday, August 18, 2010 3:18 PM
**From:** Ali Spietz <Ali.Spietz@mercergov.org>
**To:** "Ira B. Appelman" <appelman@bmi.net>
**Conversation:** Request for Public Records No. 10-411

Ira,
Attached is a letter regarding your records request.
Ali
10-411.pdf <cid:afd48c8d-89b7-4aee-93b8-f37a9a286d56>

**Ali Spietz, MMC** | City Clerk / Public Records Officer
City of Mercer Island | www.mercergov.org <http://www.mercergov.org>
P: 206.275.7793 | F: 206.275.7663
*NOTICE OF PUBLIC DISCLOSURE: This e-mail account is public domain. Any*
*correspondence from or to this e-mail account may be a public record. Accordingly,*
*this e-mail, in whole or in part, may be subject to disclosure pursuant to RCW 42.56,*
*regardless of any claim of confidentiality or privilege asserted by an external party.*



**CITY OF MERCER ISLAND, WASHINGTON**
9611 SE 36th Street • Mercer Island, WA 98040-3732
(206) 275-7600 • www.mercergov.org

**VIA EMAIL AND US MAIL**

August 18, 2010

Ira Appelman
6213 83rd Place SE
Mercer Island, WA  98040

**Re: Request for Public Records No. 10-411**

Dear Mr. Appelman:

On August 11, 2010, the City of Mercer Island received your public records request for the following:

(1) the Amy Stephson report and any other related records based on the investigation of a 2003 sexual harassment charge against the City Manager Conrad by then City Clerk Tina Eggers. The City denied access to this report in response to my 8/15/05 record request. Since then the WA State Supreme Court has decided that an investigative report is a "city document subject to disclosure under the PRA" (Morgan v City of Federal Way, 166 Wn.2D 747 (2009)).  I have attached the 11/18/03 Purchase Order to Amy J. Stephson showing she was paid for "Investigative Services," not legal advice.

(2) the Marcella Reed report (or records indicating results or conclusions) and any other related records based on the 2007 investigation into the propriety of the relationship between City Manager Conrad and Human Resources Director Kryss Segle.

Pursuant to RCW 42.56.520, the City requires an additional sixty (60) business days from the date of this letter in order to respond to your request to locate and assemble the requested records and determine whether any information in the responsive records is exempt.

If you have any questions, please contact me directly at (206) 275-7793.

Sincerely,

Allison Spietz, MMC
City Clerk / Public Records Officer
City of Mercer Island

# Exhibit S

## Ira B. Appelman

**From:**     "Ali Spietz" <Ali.Spietz@mercergov.org>
**To:**       "Ira B. Appelman" <appelman@bmi.net>
**Sent:**     Thursday, November 11, 2010 10:45 AM
**Subject:**  Request for Public Records No. 10-411

Please reply by email to let me know you have received this email.

Mr. Appelman,

Pursuant to RCW 42.56.520, the City requires an additional ten (10) days from the date of this email in order to respond to your records request below to locate and assemble the requested records and determine whether any information in the responsive records is exempt.

Request for Public Records No. 10-411 requests the following:

(1)  the Amy Stephson report and any other related records based on the investigation of a 2003 sexual harassment charge against the City Manager Conrad by then City Clerk Tina Eggers. The City denied access to this report in response to my 8/15/05 record request. Since then the WA State Supreme Court has decided that an investigative report is a "city document subject to disclosure under the PRA" (Morgan v City of Federal Way, 166 Wn.2D 747 (2009)). I have attached the 11/18/03 Purchase Order to Amy J. Stephson showing she was paid for "Investigative Services," not legal advice.

(2)  the Marcella Reed report (or records indicating results or conclusions) and any other related records based on the 2007 investigation into the propriety of the relationship between City Manager Conrad and Human Resources Director Kryss Segle.

Please let me know if you have any questions.

**Ali Spietz, MMC | City Clerk / Public Records Officer**
City of Mercer Island | www.mercergov.org
P: 206.275.7793 | F: 206.275.7663
*NOTICE OF PUBLIC DISCLOSURE: This e-mail account is public domain. Any correspondence from or to this e-mail account may be a public record. Accordingly, this e-mail, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.*

12/21/2010

# Exhibit T

## Ira B. Appelman

**From:** "Ali Spietz" <Ali.Spietz@mercergov.org>
**To:** "Ira B. Appelman" <appelman@bmi.net>
**Sent:** Tuesday, November 16, 2010 12:04 PM
**Subject:** Public Records Request No. 10-411

Please reply by email to let me know you have received this email.

Mr. Appelman,

Request for Public Records Request No. 10-411 requests the following:

(1)  the Amy Stephson report and any other related records based on the investigation of a 2003 sexual harassment charge against the City Manager Conrad by then City Clerk Tina Eggers. The City denied access to this report in response to my 8/15/05 record request. Since then the WA State Supreme Court has decided that an investigative report is a "city document subject to disclosure under the PRA" (Morgan v City of Federal Way, 166 Wn.2D 747 (2009)). I have attached the 11/18/03 Purchase Order to Amy J. Stephson showing she was paid for "Investigative Services," not legal advice.

(2)  the Marcella Reed report (or records indicating results or conclusions) and any other related records based on the 2007 investigation into the propriety of the relationship between City Manager Conrad and Human Resources Director Kryss Segle,

The City responds as follows:

. (1)  These records are exempt from disclosure pursuant to RCW 42.56.290: Current Controversy; and RCW 5.60.060: Attorney-Client Privileged Communications and/or attorney work product. Ms. Stephson's materials were prepared in anticipation of potential litigation. Ms. Stephson is an attorney, and was acting in her capacity as such. Ms. Stephson's materials are both attorney-client privileged and Ms. Stephson's work product. The City disagrees that the Supreme Court's opinion in Morgan v. City of Federal Way applies in the manner you are claiming.

(2)  These records are at the offices of the law firm Michael & Alexander, PLLC in downtown Seattle. There are three options for viewing the records:

    1.  Contact Michael & Alexander at (206) 442-9696 to set up a mutually convenient time to view the records;

    2.  Wait until the litigation has completed and the records are returned to the City to view the records; or

    3.  Pay for copying charges to have the records copied.

    Please respond letting me know which option you prefer.  Please be aware that certain documents have been produced to the plaintiff by the City in the case of Lindell v. City of Mercer Island, et al., that are subject to a protective order, and which are exempt from production under the Public Records Act. When you have indicated to me your preferred method of viewing the records, the City will provide you with a detailed log of the materials that are subject to the protective order in the lawsuit, and which are exempt from production under the Act.

If you have any questions, please contact me directly at (206) 275-7793.

**Ali Spietz, MMC | City Clerk / Public Records Officer**

City of Mercer Island | www.mercergov.org
P: 206.275.7793 | F: 206.275.7663
*NOTICE OF PUBLIC DISCLOSURE: This e-mail account is public domain. Any correspondence from or to this e-mail account may be a public record. Accordingly, this e-mail, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.*

# Exhibit U

## Ira B. Appelman

**From:** "Ira B. Appelman" <appelman@bmi.net>
**To:** "Ali Spietz" <Ali.Spietz@mercergov.org>
**Sent:** Monday, December 06, 2010 4:00 PM
**Subject:** Re: Public Records Request No. 10-411

Dear City Clerk Spietz:

I am trying to decide based on your three options.  How many pages are in (2) Marcella Reed report and related records.  Once I know how many pages there are, I'll get back to you on which option I will follow.

Thank you.

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA  98040-4915
appelman@bmi.net
(206)232-5411

----- Original Message -----
**From:** Ali Spietz
**To:** Ira B. Appelman
**Sent:** Tuesday, November 16, 2010 12:04 PM
**Subject:** Public Records Request No. 10-411

Please reply by email to let me know you have received this email.

Mr. Appelman,

Request for Public Records Request No. 10-411 requests the following:

(1)  the Amy Stephson report and any other related records based on the investigation of a 2003 sexual harassment charge against the City Manager Conrad by then City Clerk Tina Eggers.  The City denied access to this report in response to my 8/15/05 record request. Since then the WA State Supreme Court has decided that an investigative report is a "city document subject to disclosure under the PRA" (Morgan v City of Federal Way, 166 Wn.2D 747 (2009)).  I have attached the 11/18/03 Purchase Order to Amy J. Stephson showing she was paid for "Investigative Services," not legal advice.

(2)  the Marcella Reed report (or records indicating results or conclusions) and any other related records based on the 2007 investigation into the propriety of the relationship between City Manager Conrad and Human Resources Director Kryss Segle.

The City responds as follows:

(1)  These records are exempt from disclosure pursuant to RCW 42.56.290: Current Controversy; and RCW 5.60.060: Attorney-Client Privileged Communications and/or attorney work product. Ms. Stephson's materials were prepared in anticipation of potential litigation. Ms. Stephson is an attorney, and was acting in her capacity as such. Ms. Stephson's materials are both attorney-client privileged and Ms. Stephson's work product. The City disagrees that the Supreme Court's opinion in Morgan v. City of Federal Way applies in the manner you are claiming.

(2)  These records are at the offices of the law firm Michael & Alexander, PLLC in downtown Seattle.  There

12/21/2010

are three options for viewing the records:

    1.  Contact Michael & Alexander at (206) 442-9696 to set up a mutually convenient time to view the records;

    2.  Wait until the litigation has completed and the records are returned to the City to view the records; or

    3.  Pay for copying charges to have the records copied.

Please respond letting me know which option you prefer.  Please be aware that certain documents have been produced to the plaintiff by the City in the case of Lindell v. City of Mercer Island, et al., that are subject to a protective order, and which are exempt from production under the Public Records Act.  When you have indicated to me your preferred method of viewing the records, the City will provide you with a detailed log of the materials that are subject to the protective order in the lawsuit, and which are exempt from production under the Act.

If you have any questions, please contact me directly at (206) 275-7793.

**Ali Spietz, MMC** | City Clerk / Public Records Officer
City of Mercer Island | www.mercergov.org
P: 206.275.7793 | F: 206.275.7663
*NOTICE OF PUBLIC DISCLOSURE: This e-mail account is public domain. Any correspondence from or to this e-mail account may be a public record. Accordingly, this e-mail, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.*

# Exhibit V

# M I C H A E L   *j*   A L E X A N D E R   PLLC

*Thomas P. Holt*
*(206) 442-9696*
*tom@michaelandalexander.com*

December 7, 2010

*Via Email*

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040
appelman@bmi.net

Re:   Your Mercer Island Public Records Requests Nos. 10-406 and 10-411

Dear Mr. Appelman:

It has come to our attention that you have made various additional requests for
information directly to City of Mercer Island employees in relation to your two requests
for public records identified by the City as Request No. 10-406 and Request No. 10-411.
Specifically, we understand that you have repeatedly telephoned Mercer Island City
Clerk Ali Spietz and requested that she identify for you the number of pages present in
certain records responsive to your requests.

As has been communicated to you on numerous occasions, the records responsive to
requests Nos. 10-406 and 10-411 are not physically present at the City of Mercer Island's
City Hall, but are instead at our offices.  This is a result of our role as defense counsel in
the lawsuit *Lindell v. City of Mercer Island, et al.*, United States District Court, Western
District of Washington No. C08-1827JLR.  Based on this circumstance, you have been
repeatedly asked to direct correspondence related to your requests Nos. 10-406 and 10-
411 to our offices, rather than to City Hall.

On behalf of the City, we are now reiterating that request.  Thus, once again, if you have
questions related to Request No. 10-406 and/or Request No. 10-411, please direct those
questions to our offices, not to City Hall.  Of course, if you have any *new* requests for
public records from the City of Mercer Island, such requests must be made directly to the
City through its regular procedures.  Such requests are not effective if made to us, as we
are not a public agency.

Ira B. Appelman
December 7, 2010
Page 2

With respect to your specific inquiries, we understand that you want to know how many pages exist in what you have identified in your request No. 10-411 as the "Marcella Reed report (or records indicating results or conclusions) and any other related records based on the 2007 investigation into the propriety of the relationship between City Manager Conrad and Human Resources Director Kryss Segle." Per Ms. Spietz's email response to Request No. 10-411 dated November 16, 2010, we can provide you with a page count of the requested records in order for you to determine whether you would like to have them duplicated.  In order to do so, however, we require further clarification as to the nature of your request, as there is no specific record that fits the description of "Marcella Reed report (or records indicating results or conclusions)."  If you wish us to calculate the number of pages for a more specific request, please contact us at your convenience to discuss the nature of the records sought.

Very truly yours,

MICHAEL & ALEXANDER PLLC

Thomas P. Holt

TPH:ss
cc:     Katie Knight, Esq.
         Ali Spietz
         Suzanne Michael, Esq.
         Stephanie Alexander, Esq.
         Cynthia Straatman

651 28

# Exhibit W

# QFC VILLAGE
# REZONE UPDATE II

**Hollywood Video developers still refuse to reveal their QFC Village site plan.**

**Planning Commissioner Ledbetter admits secret business talks with developer**

**Truth about rezone: Mayor Clibborn & City Council rejected "senior housing."**

CITY OF MERCER ISLAND
ORDINANCE NO. 97C-004
(Excerpts: Full text available in Mercer Island Reporter 5/14/97 and from City Hall 236-5300)

PART I  GENERAL PROVISIONS
A.  Purpose
The purpose of the planned business zone is to provide a location for a mix of small scale neighborhood oriented business, office, service, public and residential uses in high quality, coordinated developments which are compatible with adjacent residential areas.  Development in the PBZ will be subject to requirements and design standards as further set forth herein

B.  USES PERMITTED
(1) Public utility and governmental buildings or structures including art galleries, libraries and museums.
(2) Day care
(3) Structures for use of licensed practitioners (dentists, physicians, etc.)
(4) Barber shops and beauty shops
(5) Business or professional studios and business or professional offices.
(6) Hand laundries, clothes cleaning agencies and pressing shops.
(7) Light automobile repairs, battery service and tire shops, service stations and self-contained public garages. Open spaces in this zone may not be used for storage, display, or sale of used vehicles or equipment.
(8) Locksmiths, shoe repairing, tailoring and similar light repair shops.
(9) Printing establishments and newspaper printing.
(10) Real estate sales offices.
(11) Restaurants, cafeterias, catering.
(12) Retail stores and personal service shops.
(13) Banks and theaters.
(14) Recreational area commercial; provided that, teen dances and teen dance halls as defined herein are not permitted uses.
(15) High technology, biomedical, or business including light assembly, clean manufacturing, and research development.
(16) Single family residences limited to single family detached, single family semi-detached, townhouses, and patio homes.
(17) Commercial public storage facilities, including screened outdoor storage and indoor storage and accessory caretaker office/resident; provided such use shall not abut 84th Avenue SE or SE 68th Street.

C.  USES ENCOURAGED
Provided that there is transit service available, a sheltered transit stop and associated parking("transit center") shall be a public benefit feature encouraged PBZ.  Appropriate incentives for the inclusion of a transit center in the PBZ shall be established by the Design Commission in conjunction with review and approval of a PBZ Site Plan and Major New Constructions

PART II DEVELOPMENT STANDARDS - GENERAL
A.  BUFFER REQUIREMENTS
All structures and off-street parking shall be setback from the perimeter property line of the PBZ as follows:
(1) Adjacent and parallel to 84th Avenue SE - seventy-five feet (75')
(2) Adjacent and parallel to SE 68th St. for 200' east of the intersection of SE 68th Street and 84th Avenue SE - thirty-five feet (35')
(3) Beginning from a point seventy-five feet (75') east of the southwest corner of the zone east to a point three hundred forty five feet (345') from the southwest corner - seventy-five feet (75') for nonresidential uses -twenty-five feet (25') for residential uses.
(4) The remainder of the zone - twenty-five feet (25') - zero feet (0) where the boundary is adjacent to the Fire Station and utilities substation.

PART IV  DEVELOPMENT STANDARDS - RESIDENTIAL
A.  CRITERIA FOR RESIDENTIAL UNITS
The intent for residential development in PBZ is for a variety of smaller size housing units than the surrounding neighborhood, developed in a planned a coordinated manner.  No residential units shall be located under or over another unit or within a commercial structure.

B.  BUILDING HEIGHT LIMIT
No residential structure shall be erected to a height in excess of thirty(30) feet.  Appurtenances as specified in Section 19.04.0501 SINGLE FAMILY of this may extend to a maximum of five(5) feet above the height allowed for the structure..

C.  PARCEL AREA REQUIREMENTS
For all residential parcels, the average parcel size shall be 7200 square feet, including access driveways and other amenities included in residential parce

D.  GROSS FLOOR AREA AND LOT COVERAGE
For all residential parcels, the gross floor area ratio shall not exceed 45% and the lot coverage shall not exceed 35%, provided that no residential structu shall exceed 2800 square feet, including garage.  Exceptions to the lot coverage shall be allowed as established in Section 19.04.0502 of this title.

F.  MAXIMUM NUMBER OF RESIDENTIAL UNITS
(1) The maximum number of residential units allowed in the PBZ shall be 30.
(2) The maximum number of attached units in any single structure shall be no more than four.

PART VII  DEFINITIONS
D.  PATIO HOME - A single family residence on a separate parcel with open spaces on three sides and with a court.
F.  SINGLE-FAMILY-SEMIDETACHED - A residence that is attached to another dwelling unit by a common vertical wall, with each dwelling unit located on separate lot.
G.  TOWNHOUSES - A single family residence which has a front and rear yard.  No dwelling unit is located over another dwelling unit.  Each dwelling uni separated from another unit by one or more vertical common walls.

1/29/98

# SPECIAL PRIVILEGES FOR WELL-CONNECTED DEVELOPERS

## Latest news: developers seek special waiver

QFC still owns the Shopping Center. Developers O'Shea and Lewis have applied to divide the Center into five parcels (lots) to facilitate financing. The staff was going to approve the division without a public hearing[1]. I filed an objection because City Code requires a public hearing where the developers must present their Site Plan for QFC Village. Now the developers have applied for a **special waiver** so they can divide the land without a public hearing where they would have to present their Site Plan. On December 3rd the Planning Commission granted the waiver. Some of us appealed. This Monday, February 2nd, the City Council will consider whether the developers deserve the special waiver.

From the beginning, the developers refused to reveal their plans. Last March, I attended the Planning Commission meeting where O'Shea and Lewis proposed the rezone of QFC Village. My neighbors said that O'Shea and Lewis were the **Hollywood Video developers** so we could not be too careful, and we wanted to see the Site Plan before they got the rezone. The developers responded that it was too expensive to produce a plan of what they intended to build until they knew they had the rezone[2]. So they got the rezone, adding housing and business park uses to QFC Village, without showing their plan.

Though the developers got the rezone last May, they still refuse to produce their Site Plan. I have appended to this flyer the drawing of their proposed division of QFC Village into five parcels. Parcel 1 is the QFC store with reduced parking. The City concedes that Parcel 1 contains fewer parking spaces than required for a grocery store[3]. This is the first step toward crowding up the Village.

It is past time for the developers to reveal their Site Plan, but this will not happen unless the public demands it. The City Council and the Planning Commission have given O'Shea and Lewis virtually everything they have asked for. There is no justification for special waivers. Our public officials should start protecting the public interest.

## More undo influence

Many of us believed that the developers were too close to the City. The City turned over to the developers the job of determining what the neighborhood wants. In my previous "QFC Village Rezone Update" three months ago, I showed that O'Shea formed his company to handle the QFC Village deal on June 13, 1995. Between June 24, 1995 and September 27, 1995, he gave relatively large campaign contributions to Peter Orser, John I. Nelson, and Linda Jackman, who all voted for the QFC Village rezone. I asked the City Council to reveal the full extent of the relationship of the City to the

---

[1]City of Mercer Island, DSG Permit Information Bulletin, Notice of Application, Permit #97-1482, September 25, 1997. There are actually two divisions, a lot line revision and a short subdivision, but I omit the details here.

[2]For discussion of rezone/site plan issue see Mercer Island Reporter, 2/26/97, p. A3.

[3]Memo from City Planner Ellen Miller-Wolfe to SDavid, 5/23/97, Lot Line Revision.

developers, which the Council did not do. I did not know then what was recently revealed.

When the Planning Commission met on December 3rd to consider the waiver, **Commissioner Glenn Ledbetter[4] admitted that back in July, two months after the rezone, he began business talks with the developers.** Commissioner Ledbetter was quite vague about the content of these talks. It is not clear whether the Commissioner approached the developers or the developers approached the Commissioner. The official, approved minutes of the Planning Commission state that Ledbetter "has engaged in conversations with the applicant [developers] regarding the possibility of any future sale of the property."[5] **Public officials should not profit from their exercise of the public trust.** Commissioner Ledbetter supported the rezone of QFC Village and he should not profit from that rezone. None of the other Commissioners voiced any reservations about Commissioner Ledbetter's business talks with the developers. Commissioner Ledbetter **did not agree** to end business talks with the developers and implied the talks would continue[6].

We must not allow the politicians and well-connected developers to undo what is great about our neighborhood, making the same mistakes on the South End of the Island that they have made on the North End.

### The "Senior Housing" ploy

# THE CITY COUNCIL REJECTED "SENIOR HOUSING"

Many people believe that QFC Village was rezoned for "senior housing", **but it was not.** Very few people go to City Council meetings and almost everyone depends on the Reporter to truthfully report, **which it does not.**

Councilman Orser, who is a developer himself, said at the rezone hearing that he was "not trying to develop this to design a senior housing community," and that "the quickest way to that direction, and we can do this legally, is to encumber it with a fifty-five year old age limit. There's (sic) age restricted communities all over this county... And I'm not really in favor of doing that."

Mayor Clibborn agreed, also saying at the rezone hearing on May 5th:

> "I'd like to just clarify that I'm not attempting to make this a senior -- senior housing development. I don't think that is the unmet need."

But when it was time to deceive the voters to get elected, Mayor Clibborn had a different story in the October 29th election issue of the Reporter:

> "We definitely wanted homes that would be attractive to retirees - people who were trying to move from their large homes into smaller homes. We never made any

---

[4]Glenn Ledbetter was described by the Reporter (9/7/94, p. A12) as "a realtor on Mercer Island."
[5]Planning Commission, Minutes of Regular Meeting, 12/3/97, p.1, approved 1/7/98.
[6]Official transcript of the December 3rd Planning Commission meeting, p.4.

bones about it. We felt that was an important unmet need" (Reporter, 10/29/97, p. A3).

# Where is the integrity in this process?

The City Council meetings are tape recorded. I requested a copy of the official audio tape for the May 5th QFC Village rezone hearing. I have made copies of the 18-minute segment where the Council discusses what type of housing it supports. "Senior housing" was **rejected** in favor of moderate houses (maximum 2800 square feet) on smaller lots (average 7200 square feet) suitable for young professionals with small families. I'll be happy to supply a free copy of the tape (and transcript) to anyone who wants to hear what the City Council **really** did. If you believe this deal is about "senior housing", this tape may change your idea of what kind of City Council and newspaper we really have. **YOU BE THE JUDGE.**

## What is the rezone really about?

The rezone is about crowding up the South End of the Island. Three uses were added to the fourteen neighborhood business uses already allowed in QFC Village:

> **15. High technology, biomedical, or business including light assembly, clean manufacturing, and research development.**
>
> **16. Single family residences limited to single family detached, single family semi-detached, townhouses, and patio homes.**
>
> **17. Commercial public storage facilities, including screened outdoor storage...**

The first and third added uses are business park uses. The first use wasn't even mentioned in the Reporter (4/2/97, p. A6; 5/7/97, p. A1). Why would the City Council allow a business park in the middle of a single family neighborhood? But the Reporter claims the rezone is about "retirees" who want to "downsize" (Reporter 5/7/97, p. A1; 10/1/97, p. A2). The taped record shows that the Council was not concerned with retirees and the words "senior housing", "retiree", or "retirement housing" do not appear in the revised QFC Village zoning. I have appended to this flyer much of the rezoning ordinance for QFC Village, sometimes called the Planned Business Zone (PBZ), so you can read it for yourself. The latest article in the Reporter (12/10/97, p. A7) drops all reference to "senior housing" and instead refers to "two lots for commercial buildings and one for future houses."

## Will the rezone affect the QFC store?

I don't know. The rezone destabilizes QFC Village. Before the rezone, the most profitable use of the land was for a grocery store, which has been there for over 35 years. After the rezone, the owners have options that were not there before, such as a business park or housing for young professionals with small families.

Documents[7] filed with the City of Mercer Island indicate that developers O'Shea and Lewis have the right to acquire the QFC store and parking (Parcel 1) if it ceases to operate as a grocery store:

> **"PARCEL 1 [QFC Store] PURCHASE RIGHTS**
>
> 6.1 So long as South Mercer Center, L.L.C. ("SMC") [the developers' company] is not in default under this Agreement or the Common Area Maintenance Agreement, if at any time during the term of this Declaration: (1) QFC elects to sell all or a portion of Parcel 1, (2) QFC elects to lease the entire existing building located on Parcel 1 for any use other than a grocery store or (3) QFC ceases to operate a grocery store on Parcel 1 for an uninterrupted period of five(5) months, SMC shall have the time periods described below in which to exercise its right to acquire that portion of Parcel 1 to be sold, leased or closed as provided above."

Evidently, the developers believe that the closing of QFC is enough of a possibility that they need to protect themselves with a purchase rights section.

## Attend the City Council meeting on February 2nd

Woody Allen once said that 80% of success is showing up. That's the way the City Council works. At the April 21st Council meeting that considered the rezone, Councilmember Orser stated the formula: if not very many people show up, then they are doing a good job. The more people show up, the worse they are doing.

The meeting to consider the special waiver starts at 7:30PM this Monday (February 2nd) in Council chambers at City Hall. City Hall is located at 9611 SE 36th, between the bottom of Gallagher Hill and the East Channel Bridge to Bellevue.

The Mercer Island Reporter has been providing biased coverage of the QFC rezone. For example, in the story on the December 3rd Planning Commission meeting where the waiver was granted, the Reporter (12/10/97, p.A1) ran the headline, "Developers must submit site plan for QFC Village," which is the opposite of what happened. If you are interested in receiving information on what is happening at QFC Village, fill out the form below and send it to me.

Ira B. Appelman
6213 83rd Place S.E.
Mercer Island, WA 98040-4915
232-8511
IBAppelman@worldnet.att.net

-----------------------------------------------------------------

[7]Declaration of Restrictions and Grant of Easements, 11/10/97, pp. 11-12.

# Exhibit X

# Disinformation undermines community

The recent attack piece that darkened Islander mailboxes by the self-named "Mercer Island Community Council" is the latest disinformation designed to undermine public support for community projects.

In what has now become a worn-out tactic, the naysayers ignore all that is good and positive in our community in an effort to rally voters under the banner of "just say no" to anything but the status quo.

First, what is the so-called Mercer Island Community Council? It is a name that one person, Ira Appelman, has given himself in order to cloak his views with an official imprimatur. There are no meetings, no members and no officers. The sad part is that Mr. Appelman is a very bright and involved community member. He does not need to call himself a community council.

The target of the latest attack piece was the City Council's approval of the new community center. As much as Mr. Appelman would like us to believe otherwise, the converted elementary school

that we now call a community center has to be replaced from the ground up. The suggestion that we can renovate the center just at Island Crest, Lakeridge and West Mercer elementary schools were renovated ignores the fact that when you renovate a school, you end up with … yes, a renovated school — not a community center.

A gym that works for 8-year-olds is unsuited for most of us who are a little older. Cinder block walls and low ceilings do not lend themselves to expandable multi-purpose rooms. In the current center, our seniors are literally being sent back to grade school for recreational and social activities.

Similarly disconcerting is Mr. Appelman's suggestion that the council has purposely let the building deteriorate by skimping on maintenance. Unlike what the county did at the Kingdome, we were not going to spend money on maintenance so the wrecking ball could have a well-maintained building to destroy.

Mr. Appelman faults the council for



## DAN GRAUSZ     JIM PEARMAN

### ISLAND FORUM

ignoring voters who soundly rejected the $19.1 million community center bond issue back in 1998. Of that money, about $16 million was earmarked for construction costs — the equivalent of about $20 million in 2004 dollars; the rest was for land. What the council approved was a $13.1 million construction budget — a reduction in cost of almost $7 million. This council does not ignore voters.

Even those of us who were not on the council back in 1998 heard the message loud and clear. Scale it back, do not waste money, no frills. Time and again we sent the architects back to the drawing board with instructions to do better. For the naysayers, however, no effort is ever enough and no accomplishment is ever commendable.

This council unanimously approved the project even though its members include leaders on both sides of the 1998 community center campaign. A policy of constructive activism allowed this council to end up with a project that could reach across the political spectrum and appeal to even the staunchest fiscal conservatives.

The city has not squandered its reserves on this project. First, spending money on programs that especially benefit seniors and children is not squandering anything. Second, other monies in the reserves have gone toward reducing taxes, refurbishing Homestead Field, restoring the health of and expanding Pioneer Park, replacing the high school

turf and track, keeping Mary Wayne Pool open and maintaining Luther Burbank Park during 2003. Also, $1 million of the reserve funds have been earmarked to help renovate the Boys & Girls Club gym in exchange for facility time that will be available for leagues and city recreational programs.

Most important, this council has spent the reserves on projects that will have long-term benefits for our community rather than to increase staff or inflate salaries. Even the naysayers do not question the frugality with which our city is operated.

We need to continue moving forward as a community and resist the temptation to find fault under every rock. The new community center and the recent acquisition of Luther Burbank Park are integral steps in enriching our city and creating a stronger sense of community. They are positive steps that we all can and should be proud of.

*Dan Grausz and Jim Pearman are Mercer Island City Council members.*

# Exhibit Y

# Open discussion builds community

## I believe open discussion builds community by creating a sense of shared public decision making.

**Community Center Plan.** Last summer, I circulated leaflets asking the City Council's [illegible] demolition/rebuild committee for [illegible] our efficient school district remodel and moderately expanded the other elementary schools for less than half that cost, about $6 million each. Because the 1998 community center plan lost badly at the polls, the City Council structured this plan to avoid public involvement and a vote. I urged that Islanders, not the council, should decide the matter.

I am a scholar of city politics. I am the only Islander who has attended every City Council meeting for nearly seven years. I tape the meetings. Twice, city staff have asked for copies of my tapes. My detailed, footnoted leaflets have set a new standard for scholarship in local politics, which is too often characterized by name-calling and innuendo.

Recently, Council members Jim Pearman, and Councilmembers Jim Pearman and Dan Grausz attacked my public involvement (Reporter, 12/17/03). "Disinformation undermines community"). According to them, I am a "very bright," "involved community member," who sadly is also a "naysayer" who "ignores all that is good and positive in our community," and has "darkened Islander

mailboxes" with leaflets. These two and their colleagues claim (Reporter, 12/24/03) claim to encourage open public debate!

**Suppressing Public Debate.** This transparent attempt by Pearman and Grausz to suppress public debate does not surprise me, as they have tried it before. In 1998, Pearman was co-chair of the Community Center Task Force. I favored renovation and challenged Pearman for greatly expanding the community center and impacting the Mercer View neighborhood (Reporter, 9/16/98).

I received an angry phone call from Pearman urging me not to oppose the bond issue and warning me not to associate with "those people" who were opposing the bond. The bond lost with only 33 percent of the vote, the biggest defeat of a bond issue in Mercer Island history.

In 2001, Grausz authored a restrictive tree ordinance. I favored a much more moderate approach of regulating trees only for public safety. I knew that a referendum could stop the ordi-

I R A
APPELMAN
ISLAND
FORUM

nance and proceeded to organize.

I received a phone call from Grausz. He urged me not to pursue the referendum. I ignored Grausz, and hundreds of Islanders joined with me to gather signatures and force the repeal of the restrictive tree ordinance.

**Complying with state law.** Over the years many Islanders have generously offered to provide funds. However, I did not think it was right to put political money into my own bank account. I spent hundreds of dollars of my own money printing thousands of leaflets, which I delivered door-to-door, since mailing is expensive.

In 2001, I founded the Mercer Island

Community Council (MICC) so I could fully comply with state law in accepting funds. Technically, the MICC defeated Grausz's restrictive tree ordinance. Hundreds of Islanders contributed funds for printing and postage. The birth of the MICC was covered in the newspaper (Reporter, 10/24/01) and is noted in my leaflets. Pearman and Grausz claim that, by complying with state law, I am using the MICC to "cloak my views."

MICC. I am actually using the MICC to distribute information to Islanders and to facilitate Islanders getting involved in local issues, which is what Pearman and Grausz fear.

In my opinion, the greatest threat to our parks is the City Council. In 1997, they tried to destroy Mercerdale Park by putting the fire station there. In 2002, it was a housing development in upper Luther Burbank Park. In 2003, it's cell towers in Clise Park. Over a year ago at the Sept. 9, 2002 meeting (Agenda Bill 3699 Council 2003-2004 Work Plan — Major Projects), council members dis-

cussed their plans to commercialize lower Luther Burbank Park.

My dream for the MICC is to facilitate the creation of permanent, autonomous, neighborhood organizations ready to resist City Council attacks into our neighborhoods.

**Open Discussion Builds Community.** Pearman and Grausz believe open discussion undermines community. Through flattery, cajolery and intimidation, they try to co-opt people with alternative views. Those who resist risk not have a choice. Those who resist risk being called "naysayers," who "ignore all that is good and positive in our community."

I believe open discussion builds community by creating a sense of shared public decision making. Why is the City Council so terrified of open discussion and a vote of the people?

I would be happy to provide copies of my leaflet to Islanders who can decide for themselves whether it is "naysaying," or "yessaying" to a renovation solution the City Council is trying to suppress.

Ira Appelman can be contacted at appelman@bmi.net or at 232-8511.

# Exhibit Z

090509 0465781-001
$45.00 R #SUCCESS-00
tid:1660266

**STATE OF WASHINGTON
SECRETARY OF STATE**

This Box For Office Use Only

**For use when paying fees by Credit/Debit Card**

*Filing by fax is subject to an additional $20.00
expedited filing fee, per entity. Chapter 434-112-
080 WAC*

Completed faxed requests are returned via standard mail, customer requests
are not returned by fax

**DATE:**   March 4, 2009

# CREDIT/DEBIT PAYMENT AUTHORIZATION

All submissions are subject to filing and legibility requirements pursuant to Chapter 434-112-040 (5) WAC & 434-112-045 WAC

**TRACKING I.D. NUMBER:** _____
*(Only for previously submitted documentation)*

**NAME OF ENTITY:**   Mercer Island Community Counsel

**UNIFIED BUSINESS IDENTIFIER NUMBER (UBI):**   602129618

**TYPE OF SERVICE REQUESTED:**   Annual Reports for years 2004-2008

VISA MAST

**CREDIT CARD NUMBER:**

**CARDHOLDER NAME AND BILLING ADDRESS:**

Name: _____ Stephanie R. Alexander   *(As it appears on the credit/debit card)*

Address: _____ 1191 Second Avenue, Suite 1440   *(As it appears on the billing statement)*

City   Seattle   State   WA   Zip Code   98101

**EXACT PAYMENT AMOUNT AUTHORIZED: $**   $45.00

| X | Stephanie R. Alexander | 3.4.09 | 206-442-9696 |
|---|---|---|---|
| **Authorized Signature** | **Printed Name** | **Date** | **Phone Number** |

Office of the Secretary of State, Division of Corporations and Charities
**Fax (360) 664-8781 or Fax (360) 664-0055**
All questions regarding fax filing should be directed to (360) 725-0377

This attachment may contain confidential and privileged information. If you are not the intended recipient, please destroy
this document immediately, and notify the sender by phone or fax. Any dissemination or use of this information by a
person other than the intended recipient is unauthorized.

Payment Authorization                     Washington Secretary of State                     Revised 02/09



03/04/2009 WED 09:44 [TX/RX NO 8150] ☑001

# Exhibit AA

# Letter to Islanders accuses city of secrecy, misconduct

## Details about Lindell lawsuit distributed to thousands of Island households

**By Mary L. Grady**
Mercer Island Reporter

Thousands of Islanders have received a fat envelope with extra postage from the Mercer Island Community Council. Many asked themselves, "who is this?"

The envelope contained a sheaf of papers regarding the firing of the former city attorney and assistant city manager, Londi Lindell, and a host of accusations about the City Council and City Manager, Rich Conrad.

The return address of The Mercer Island Community Council is the home of long-time Islander and city activist Ira Appelman. Appelman is the sole member of the Mercer Island Community Council. See related story on page A8.

In his letter to Islanders, Appelman says the firing and subsequent lawsuit filed by Lindell against members of the City Council, Conrad and other city employees illustrates what he believes is the "cover-up of misconduct and alleged misconduct at City Hall" and that the City Council "conducts its business in secret."

At the heart of the matter is the firing by the city of Lindell just a year ago. Lindell's firing also relates to the resignation of Bob Sterbank, who was paid a $137,000 settlement after just 10 months as city attorney.

**The story begins** in 2007 with the illness and death of longtime Assistant City Manager Deb Symmonds. City Attorney Lindell was promoted to fill her place and later assisted in hiring her own replacement. She encouraged

the city to hire an old friend and co-worker, Bob Sterbank, who previously worked with her at the city of Federal Way. Sterbank, who was living in Olympia at the time, was hired in early 2007. Originally set to begin work in March or early April, e-mails and correspondence obtained by the *Reporter* indicate that Sterbank had an extended transition time. Sterbank, who is married with a young child, appears not to have worked full-time at City Hall until September 2007, citing problems with finding suitable child care among other issues. Sterbank did, however, report that he was working from home a good deal. E-mails from Sterbank reporting in on days away from the office, and complaints from those who were waiting for completed work give the impression that there was frustration over unfinished legal work.

Later that year a situation regarding the city's Human Resources Director, Kryss Segle began to unfold regarding her husband, John Segle, who also works for the city. The city's nepotism policy does allow family members to work at the city under certain conditions. Kryss Segle's position in Human Resources meant that she could not be involved with employment or performance issues regarding her husband. Yet she did get involved in a union grievance filed by her husband after a disciplinary action was filed against him. By all accounts, Ms. Segle intervened improperly on these issues and there was a backlash. In the aftermath, Conrad, worried that Kryss Segle would quit, stepped in and said if Segle's husband would rip up his grievance, the notice of discipline would be removed from his permanent file.
**What many** would consider a minor incident in the imprecise business of managing people became the basis for a struggle over leadership at the city.

Sterbank, in his capacity as city attorney, sent a memo to Conrad in effect warning him that it appeared that he and Segle were having an improper relationship. Conrad had been disciplined for an improper relationship with a former employee in 2003. The employee resigned her position and received a $90,000 severance payment. Conrad then was required to attend sexual and anti-harassment training, take time off without pay and had to forgo a raise the following year.

However, the official memo dated Oct. 16, 2003, from then-mayor Alan Merkle to Conrad regarding the complaint, stated that an investigation into the matter "leads to the conclusion that you have not engaged in quid pro quo sexual harassment and that your conduct has not created a hostile work environment."

The memo does go on to say that Conrad, in his position, must be held to a stricter standard in regard to maintaining a positive work environment. Lindell was city attorney at the time of the investigation and would have presumably prepared or reviewed the memo.

**E-mails indicate** that Segle and her boss, Conrad, do have a close working and personal relationship. Conrad and Segle often met outside work, as did other city employees, presumably to unwind and discuss city business. Similar communications indicated the same type of relationship between Conrad and other city directors, including Lindell and former Parks and Recreation Director Pete Mayer.

Conrad and Segle deny a romantic relationship.

**A statement** obtained by the *Reporter*, prepared by City Finance Director

order, gives an unvarnished view of the situation. Corder wrote

that Lindell and Sterbank took on the role of whistleblowers to undermine Conrad's authority and promote their own agendas and ambitions. There was speculation that Lindell was hoping for the city manager job herself.

In late 2007, a retreat for city management was conducted to clear the air. And later, a more formal investigation into Conrad's behavior was begun. Alarmed by the sequence of events, three members of the City Council later stopped the investigation in an executive session, gave their support to Conrad and further decided in December that Lindell and Sterbank should be let go.

Weeks later, Sterbank resigned and settled with the city, signing a severance agreement that assured he would not pursue any legal action against the city. He was paid $137,000. Lindell did not resign, was fired in April 2008 and filed a claim against the city for an unlawful termination. She later filed a lawsuit

in U.S. District Court, in which she details what she considers to be an ongoing atmosphere of sexual discrimination and harassment at the city and that there have been repeated violations of the state Open Public Meetings Act. Lindell points out that she had received a rating of "outstanding performance" in her annual performance evaluations for her work at the city.

**Defendants** named in Lindell's suit are Mayor Jim Pearman, City Councilman El Jahncke, Corder and Conrad. The legal process regarding these claims is underway. No trial date has been set.

# Exhibit BB

# What is the 'Mercer Island Community Council?'

**Mary L. Grady**
Mercer Island Reporter

Island resident Ira Appelman is the sole signer, officer and apparent only member of the Mercer Island Community Council, founded in 2001.

Appelman is a longtime civic activist who focuses on the workings of the Mercer Island City Council. He often points out that he has attended all but a handful of the Mercer Island City Council meetings over the past 12 years. He sits in the same spot on the left-hand side of the front row at each City Council meeting, and until the Council began televising its meetings last summer, recorded each meeting on a tape recorder held high.

Appelman has criticized or opposed several actions of the Council on a variety of topics over the years. Examples include his opposition to the tree ordinance initially proposed in 2001, gathering nearly 4,000 signatures to overturn the City Council's initial ordinance. He was against the parks operation levy for Luther Burbank Park in 2003, which did pass, and later opposed the two parks measures that were on the November 2008 ballot, saying that the city was imposing too many taxes on Islanders. In a Forum printed in the *Reporter* on Oct. 8, 2008, Appelman, along with Islanders Marty and Thornton Gale, accused the city of creating a "slush fund to be used as the City Council dictates."

Appelman has said that he is "for open and honest government, something we [citizens] do not have."

In his letters sent to Islanders recently, Appelman goes beyond the issue of Londi Lindell's lawsuit against the city to include a litany of complaints against the city, primarily accusing the City Council of secrecy. He lists city actions regarding the higher density housing briefly proposed for First Hill, the "invitation" to Tent City 4, changes to Island Crest Way at Merrimount and city involvement in the Boys & Girls Club PEAK project as other examples of "secrecy and manipulation." He accuses the city of violating the Open Public Meetings Act, which Lindell also does in her lawsuit against the city.

Appelman states that his goal is "open and honest government" and ensuring that citizens do not pay for more than what they need. In his argument against the 2008 parks funding measures, he makes the case that the operations levy for Luther Burbank in 2003 was promised by the city to be a "one-time deal." Yet the city was again looking for funds five years later.

Appelman is no ordinary citizen activist. He does his homework and is well prepared. He often requests records from the city regarding Council actions and city business. According to data kept by the city regarding public data requests made by citizens, one quarter of the total amount of staff time required to process these requests, or 28 hours for the first three months of 2009, was taken up processing two requests by Appelman for information regarding the city's e-mails and documents on the Merrimount-ICW intersection alone. Those hours do not include times and charges for outside attorneys to review the documents for attorney-client privileged communications before they are released.

According to City Attorney Katie Knight, about $10,000 is budgeted each year for such review. Knight said she has already asked for more money to pay for outside legal review in the next city budget cycle.

Enclosed in Appelman's mailing to Islanders is a pink envelope asking for contributions to defray the cost of the mailing and other expenses.

Records from the state Public Disclosure Commission show that the Mercer Island Community Council spent $1,600 on postage in the first three months of the this year.

Assuming that the money was spent on the recent mailing and the postage on each envelope was 59 cents, the equivalent of 2,700 households have received his mailing. The letter also included a pink envelope to defray expenses. The PDC shows the names and addresses of a dozen Islanders who have contributed a total of about $1,200 so far.

*For more information about the Mercer Island Community Council, go to www.pdc.wa.gov.*

# Exhibit CC

# Mercer Island REPORTER

SERVING THE MERCER ISLAND COMMUNITY SINCE 1947

**Mary L. Grady,** Editor
**Sandy Payson,** Publisher

Published by Sound Publishing, Inc.

# Motives for mailings

What are the motives behind the mailings sent to Islanders regarding the firing of former city official Londi Lindell and allegations of secrecy and deception at City Hall?

In a letter sent to thousands of Island households, Islander Ira Appelman, with the assistance of documents and likely the urging of Ms. Lindell, warns citizens of mismanagement and secrecy at City Hall. Ms. Lindell has filed in federal court asking for monetary damages alleging, among other things, sexual harassment, lack of due process and retaliation by city leaders who fired her last year.

Our story on page 1 attempts to describe the events that led to the firing of Ms. Lindell. Yet facts are not always helpful when trying to describe the complex interactions of human beings in the workplace.

After talking to many, reading hundreds of pages of e-mails, memos and other documents, it is clear that no one is completely without some blame here. But is the fuss about bad behavior, some poor judgment or criminal intent?

What is troubling is the way that Ms. Lindell may be using her access to what would ordinarily be privileged and protected communications to build her case — at least in the public's eye. But the letter goes beyond the particulars of Lindell's dismissal to address a much broader range of alleged abuses by the city. It appears that the real mission is to sow mistrust and animosity toward City Manager Rich Conrad, the City Council and City Hall itself.

Mr. Appelman has been long associated with campaigns of this type. Mr. Appelman, who has attended all but a handful of City Council meetings over the past decade, is more than eager, it appears, to find any way he can to discredit the city.

And what of the City Council's role in all of this? Elected by us, it is ultimately their charge to determine how City Hall is run and to make changes when they feel it is necessary. City Councilmembers did so in late December of 2007 when they decided to support Mr. Conrad and remove Ms. Lindell.

As citizens, we cannot and will not tolerate sexual harassment or secrecy within our city government. We welcome the efforts of individuals who ask hard questions and probe a bit further to find out the truth. But in this instance, we are not sure whether the motivation behind these actions is for better government, a more personal agenda or simply revenge.

# Exhibit DD

From: Ali Spietz Ali.Spietz@mercergov.org
To: Mary Grady mgrady@mi-reporter.com
Cc: Katie Knight Katie.Knight@mercergov.org
Subject: Additional information requested
Date: 4/9/2009 2:28:53 PM
Attachments: Lindells Amended Answer to Defendants Counterclaims.pdf; Mercer Island Community
Council Articles_20090302131704.pdf; MICC Annual Reports_20090309130747.pdf; MI Community
Council PDC Forms.pdf

Hi Mary,

Attached are documents that Katie asked I send to you.  Please let me know if you have any
questions.

Ali

<<Lindell's Amended Answer to Defendant's Counterclaims.pdf>> <<Mercer Island Community Council
Articles_20090302131704.pdf>> <<MICC Annual Reports_20090309130747.pdf>> <<MI Community Council
PDC Forms.pdf>>

**Ali Spietz, CMC** | City Clerk, City of Mercer Island

P: 206.275.7793 F: 206.275.7663 | www.mercergov.org

*NOTICE OF PUBLIC DISCLOSURE: This e-mail account is public domain. Any correspondence from or to this e-mail account
may be a public record. Accordingly, this e-mail, in whole or in part, may be subject to disclosure pursuant to RCW 42.56,
regardless of any claim of confidentiality or privilege asserted by an external party.*

# Exhibit EE

## Ali Spietz

| | |
|---|---|
| **From:** | Ali Spietz |
| **Sent:** | Friday, April 03, 2009 12:29 PM |
| **To:** | 'Mary Grady'; 'Elizabeth Celms' |
| **Cc:** | Katie Knight; Joy Johnston |
| **Subject:** | RE: dollars spent on fulfilling public information requests |
| **Attachments:** | Public Records Request for MIR.xlsm; PRR DATA.pdf |

Mary and Elizabeth,

This email responds to your request for "the amount of dollars the City has spent fulfilling public information requests and for whom, including the Mercer Island Reporter, for 2006, 2007, 2008 and YTD 2009." Thank you for your patience in receiving this information. The City does not track and has no practical means of calculating the actual cost of responding to public information requests. However, the City does track the amount of time City staff members spend responding to requests made under the Public Records Act.

An Excel spreadsheet that details the time City staff has spent on individual requests over the last four years is attached for your reference. While this spreadsheet does not directly answer the question of how many dollars the City spends on fulfilling public information requests, we hope that it assists you to understand the amount of time the City spends responding to public records requests. Each sheet (by year) contains the name of the requestor, a brief description of the request, the date the request was received, how many staff worked on the request and the total staff time spent responding to the request. Any blue highlights indicate a request that was handled by internal staff and outside counsel (staff time noted is only for internal staff, outside counsel time is not noted).

To help summarize the information in the spreadsheets, I created the attached PDF document that summarizes the data regarding our records requests for the past 4 years.

Please note that although the Public Records Act does not require the City to create documents in response to a records request (see WAC 44-14-04003(5)), I created these documents as a courtesy to help you obtain the information you are looking for.

If you have any questions about the data in the attached documents or about specific requests, please let me know and I'd be happy to go over it with you. If you would like salary information to quantify staff time spent on records requests please contact me.

Please note that beyond staff time, there are additional costs the City incurs to respond to public records requests (e.g. overhead costs, training costs, and supplies). The City cannot recover these costs from requestors. The only costs we can pass on to requestors is the per page cost of any copies that are provided to the requestor. The City cannot charge the requestor for its time and costs spent retrieving, inspecting, redacting, and/or copying the documents to make them available for inspection. See WAC 44-14-070 and 44-14-07001.

Again, I thank you for your patience and I hope this information helps you better understand the City's costs in responding to public records requests.

Ali

Ali Spietz, CMC | City Clerk, City of Mercer Island
P: 206.275.7793 F: 206.275.7663 | www.mercergov.org NOTICE OF PUBLIC DISCLOSURE: This e-mail account is public domain. Any correspondence from or to this e-mail account may be a public record. Accordingly, this e-mail, in whole or in part, may be subject to disclosure pursuant to RCW 42.56, regardless of any claim of confidentiality or privilege asserted by an external party.

1

# Exhibit FF

# Ira Appelman for MI City Council

**(1) Open Government:** unresolved controversies decided by advisory vote, which worked at Mercerdale and Pioneer parks; end the "group think" that spawned the "road diet"; no more cover-ups that have led to the $1,000,000+ federal lawsuit.

**(2) Don't Toll I-90:** Ira's opponent said to be taken seriously by regional partners, we must accept tolls between MI and Seattle; Ira believes that we will only be taken seriously if we resist tolls, which are unfair and disproportionately affect the schools.

**(3) Don't Narrow Island Crest Way:** the road diet, narrowing Island Crest Way to one lane in each direction, to allow bike lanes has been rejected by Islander public input.

**(4) Protect Parks/Neighborhoods:** end the overdevelopment attacks on Mercerdale, Luther Burbank, Clise, and other parks; give substantial weight to the concerns of neighbors, who are currently ignored by the City Council.

**(5) Fair Treatment for Seniors:** senior lunches back in the community center; a reasonable budget to support senior projects; a Town Center more friendly to seniors.



1999 Citizen of the Year

The Mercer Island City Council selects

Ira Appelman,
*Steering Committee Member*
*Mercer Island Air Noise Abatement Committee*

In recognition of outstanding contributions to the community.

Awarded this 17th day of July, 2000.

Mayor Alan Merkle

Ira was voted Citizen of the Year (with others) by the City Council!

## Twelve Years of Positive Advocacy for Islanders Without Political Connections

For 12 years Ira has helped Islanders, advocating successful, positive alternatives to Council proposals: in 1997, Council proposed building the fire station in Mercerdale Park – neighbors and Ira advocated rebuilding the fire station in its current location, thus saving the park; in 1998 Council proposed an oversized community center – neighbors and Ira advocated a smaller community center; in 2002, Council proposed commercial development and a housing development in Luther Burbank – neighbors and Ira advocated non-commercial enhancements only, with no housing; in 2005, Council proposed higher density housing in single family neighborhoods–neighbors and Ira advocate original plan of density in Town Center, not in neighborhoods; and there are many, many other positive advocacy alternatives.



# Exhibit GG

# Election filing surprises for City Council:
# Appelman to run against Grausz

By **ELIZABETH CELMS**
**Mercer Island Reporter City Reporter**
Jun 09 2009

Three Mercer Island City Council members are running for re-election this November. Councilmember and Mayor Jim Pearman will be running for Position 4, incumbent Mike Grady will run for Position 6 and incumbent Dan Grausz will run for Position 2, competing with Island citizen Ira Appelman. The names were made official on June 5, the last day for King County candidates to file for office.

Because Pearman and Grady are running unopposed, they will not raise funds for a campaign. Grausz and Appelman, who will be running for City Council for the first time, begin their campaigns for Pos. 2 this month.

Councilmember Grausz announced that he would be running for re-election in February. He learned that he would be running against Appelman last Friday.

"This doesn't change my approach. This is the fourth time I've run, and every time before I've had an opponent. This is the way the system works. It gives people a choice," Grausz said, adding that he would begin raising funds for his campaign this week.

An Island resident since 1989, Grausz has served on the City Council for nine years. He first entered Island politics in 1999 on a two-year term. He was then re-elected in 2001 and again in 2005.

This year, Grausz's main priorities are creating a sociable Town Center, improving Island parks and ballfields, and protecting the city's open spaces.

"I want to make sure we have a vision for the Town Center. We have good development right now, and with the light rail that's coming in the next 10 years, we have the opportunity to really turn the Town Center into a much greater asset for our community," Grausz told the Reporter earlier this year.

Appelman will be running for City Council for the first time. However, he has been actively involved with Council issues and has attended nearly every meeting in the past 10 years. The Island resident's main objective is to ensure "open and honest" governance.

"I'd like to put the public in charge of government, because that's not the way it's working right now. As soon as members get on the Council, it becomes a clubby, insider group and the public doesn't matter in their decisions," Appelman said, adding that he intends to change this. "I'm attempting to set the highest educational standard on MI for public debate. I have audiotapes. I have documents. You shouldn't debate anything unless you have the evidence."

Appelman has a Ph.D. in experimental psychology from Stanford University.

Councilmember Grady, who will be entering his second term, places a high priority on environmental issues; in particular, introducing more clean-fuel cars to the Island.

"It's a good time now [to be on the City Council], particularly with climate change and energy efficiency," Grady said, adding that he hopes to supply Island parking lots with re-charging facilities for electric cars.

Island Mayor Jim Pearman said that he was not originally planning to run for a third term this November; however, the escalating economic crisis compelled him to keep his seat.

"I don't think this is the right time for me to exit," he said. "We're making some new decisions in the sense of revenue streams. This isn't the time to break someone in and train them. You need somebody

with expertise to make decisions that will impact the budget like never before."

Asked if he would consider accepting the position of mayor once again, if elected by the future Council, Pearman was ambivalent.

"For the next two years, I would be interested in being mayor. But the time commitment is absolutely huge. There is a lot of behind-the-scenes work you don't see," said the incumbent, who is the father of two daughters.

More detail about Mr. Appelman and his campaign views will be published in the Reporter in a coming issue.

# Exhibit HH

**Mercer Island Community Council**
**6213 83rd Place S.E.**
**Mercer Island, WA  98040-4915**

December 23, 2010

Dear Fellow Islander:

In 2009, I wrote Islanders warning of a continuing cover-up of misconduct and alleged misconduct at Mercer Island City Hall that could cost taxpayers millions of dollars.  Former City Attorney Londi Lindell is suing the City in federal court for sexual harassment.  I have copies of invoices that show that outside attorneys have charged $430,000 to defend the City through June 2010.  I believe through November the charges have exceeded $700,000.  With a trial set for April 4, 2011, attorney's fees to defend the City will top $1,000,000, and that doesn't include City staff time such as the City Attorney's time.

I have enclosed a DVD that presents Lindell's case against the City.  The 45-minute DVD, which plays on your TV or computer, was obtained from the United States District Court, Western District of Washington at Seattle, and is part of the record of this case.  The DVD includes video of under-oath depositions (starting about 3 minutes into the presentation) of City Manager Rich Conrad, Mayor Pearman, and City Attorney Katie Knight.

Here are the facts and issues as outlined in Court documents and other available information:

**The Proposition for Sex.**  On or around 2001, City Manager Rich Conrad propositioned for sex one of his female employees, City Clerk Tina Eggers, a young married woman with children.  She refused.  Consistent with City policy, Eggers reported the incident to Human Resources Manager Kryss Segle, a known confidant of Conrad, and Segle covered up the incident.  In 2003, Eggers filed a sexual harassment complaint against Conrad.  Conrad admits to all this under oath on the DVD and in other filings.

As a result, the woman, Eggers, was booted out of the City, with a $90,000 "settlement" payment.  The man, Conrad, was given token discipline including a week without pay.  As the DVD shows, Conrad believes he was disciplined for making an employee "uncomfortable," and Conrad says that propositioning for sex a woman in his employ did not violate the City's sexual harassment policy.  In letters circulated among staff, it was falsely claimed that Eggers, who had led the City's website development, was leaving because she had decided to set up a company to market her website skills.  The Councilmembers responsible for supervising Conrad during this incident were Alan Merkle (Mayor), Bryan Cairns (Deputy Mayor), Dan Grausz, El Jahncke, Jim Pearman, Susan Blake, and Sven Goldmanis.

**Segle Discipline.**  The immediate cause of the Lindell lawsuit began in June 2007.  City employee John Segle and other male employees were viewing sexually explicit material on a city computer at work.  When management called a meeting to remind them that was unacceptable behavior, John Segle made a remark that management took as insubordinate.  It was decided that Segle would receive minor discipline, a written warning.  That would have ended the matter except for the following:

In 2006, Kryss Segle, John Segle's wife, was promoted to Human Resources Director in violation of the City's Nepotism Policy, which prohibits a spouse of a director from working at the City.  Kryss Segle was instructed that someone else would serve as human resources director for her husband's employment, and she was prohibited from involving herself.

In response to the written warning, John Segle submitted a grievance that was drafted by his wife, Kryss Segle, even though, as director, she was supposed to represent the City and she had been prohibited from involving herself in his employment.  Furthermore, Kryss Segle intervened with City Manager Conrad, threatening to resign if he didn't reverse John Segle's discipline, which Conrad eventually did.  That would have ended the matter except for the following:

**Sterbank Memo.**  City Attorney Bob Sterbank found out about the Segle discipline matter and was told by City Manager Conrad that Conrad had not sought City Attorney Sterbank's advice, because he

knew what the advice would be and didn't want to follow it. In response, City Attorney Sterbank wrote a legal memo outlining the risks to the City for Conrad's actions. I have enclosed a copy of the memo. The City at first violated a federal court order to keep the memo from the public, so it's worth reading.

In response to the Sterbank memo criticizing the City Manager's actions, Conrad hired an outside investigator, Marcella Reed, to help clear his name. Reed, however, found that "Kryss Segle has violated the City's Ethics Code," and "The City Manager has potentially violated the City's Ethics Code. " Reed recommended that Conrad be fired. With the City Council's approval, Conrad terminated Reed's investigation. Sterbank and Lindell were eventually terminated for opposing the actions of Conrad.

**Kryss Segle Flashing Incident**. In a related incident, Kryss Segle , as Human Resources Director, was conducting an exit interview with a retiring police officer. According to Segle, she was not wearing underwear and she "flashed" the police officer. Segle related this incident to a number of people. It is not clear in the record whether the incident actually occurred, though it may become clearer during the trial. It is clear that Segle said she had done it.

### Is Mercer Island a Valueless Community?

When City Manager Conrad admitted on the DVD that he had solicited sex from an employee and then claimed it wasn't against City policy, I was hoping he would be asked if he had solicited sex from any other employees since he believed it wasn't against City policy. As the DVD suggests, the cover story was that Conrad made an employee "uncomfortable," which is the exact phrase former Mayor Merkle used in describing the incident to the Seattle Times (10/30/09, p. B2). They obviously didn't think Conrad would ever be questioned **under oath** and be forced to admit the proposition for sex. No councilmember, then or now, has publicly objected to Conrad's behavior. Since I broke this story with my 2009 mailing to Islanders, I have been made aware that a significant segment of Islanders either doesn't disapprove of or doesn't care about Conrad's misconduct and alleged misconduct. Is the City Manager's proposition and subsequent cover-up really consistent with the values of Mercer Islanders?

### Secrecy, Manipulation, and Illegitimate Government

Lindell's complaint is important because it is the first time an insider has revealed what really goes on at City Hall, out of public view. I am for open government, something we do not have. I have attended every meeting of the City Council for over thirteen years, and I believe the City Council typically conducts its business in an illegitimate way. In other mailings, I have provided many examples.

I am hoping if it can be shown how illegitimate, secretive, and manipulative our current City Council is, then Islanders will demand that we move closer to a legitimate, open and honest government. That is why I am asking for your help to circulate the DVD, so Islanders can see actual testimony of appointed and elected officials engaged in illegitimate activity.

It costs thousands of dollars and hours of uncompensated time to circulate these materials. If the Mercer Island Distorter was doing its job instead of joining in the cover-up, these mailings would not be necessary. If you agree this matter is important enough to bring to the attention of Islanders, I am asking you to send a check for your most generous contribution in the enclosed return envelope made out to the Mercer Island Community Council.

Thank you,

Ira B. Appelman
Mercer Island Community Council
appelman@bmi.net
(206) 232-5411