1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   LONDI K. LINDELL,                           CASE NO. C08-1827JLR

11                    Plaintiff,                 ORDER GRANTING MOTION
                                                 FOR PARTIAL SUMMARY
12              v.                               JUDGMENT ON PUBLIC
                                                 RECORDS ACT CLAIM
13   CITY OF MERCER ISLAND, et al.,

14                    Defendants.

15                          **I.    INTRODUCTION**

16        Before the court is Plaintiff Londi K. Lindell's motion for partial summary

17   judgment on her claim against Defendant City of Mercer Island ("the City") for violation

18   of the Washington Public Records Act ("PRA") (Dkt. # 273).  Having reviewed the

19   pleadings filed in support and opposition to the motion, the declarations and exhibits

20   attached thereto, the balance of the record, and having heard the argument of counsel, the

21   court GRANTS the motion (Dkt. # 273) and awards Ms. Lindell $90,560 in penalties plus

22   reasonable attorney fees and costs.

## II.    BACKGROUND[1]

On December 23, 2008, Ms. Lindell filed a complaint with this court against the City and individual Defendants claiming that the Defendants retaliated against and sexually harassed her in violation of 42 U.S.C. § 1983; the Washington Law Against Discrimination ("WLAD"), RCW Chapter 49.60; and 42 U.S.C. § 2000e ("Title VII"). (*See* Compl. ¶¶ 48-91.)  In addition to her employment claims, Ms. Lindell also alleged that the City had violated the PRA by failing or refusing to permit her access to information she requested on May 6, 2008.[2]  (*Id.* ¶ 91.)

The parties resolved all of Ms. Lindell's claims except her PRA claim.  By filing the instant motion, Ms. Lindell seeks summary judgment on this remaining claim.  In order to put the current motion in context, however, the court must explain the facts surrounding Ms. Lindell's employment relationship with the City, as well as the court's prior rulings on the City's claims of attorney-client privilege and protection of the work product doctrine.  Thus, at the outset, the court explains the significance of the "Segle Matter," the "Sterbank Memo," and the resulting "Reed Investigation," before beginning its analysis of the PRA claim.

---

[1] In accordance with the standard on summary judgment, as applied to the PRA, the court views the evidence in the light most favorable to the City as the nonmoving party. *Sanders v. State,* 240 P.3d 120, 129 (Wash. 2010).

[2] Ms. Lindell attempts to include alleged violations of the PRA that she claims occurred in July, August, and September of 2010.  (Youssef Decl. (Dkt. # 276) ¶¶ 24-26.)  The court declines to consider these alleged violations as they accrued almost two years after the complaint was filed and were not included in an amended complaint.

The court was not asked in this motion to reconsider its prior rulings with respect to the privilege claims made by the City.  The City concedes that, given the court's prior rulings, the issue of whether the documents were wrongfully withheld has been determined adversely to it.  Nevertheless, the court offers an explanation of the Segle Matter, the Sterbank Memo and the Reed Investigation for both background and as necessary to its analysis of mitigating and aggravating factors under the PRA.

**A.      Ms. Lindell's Employment With the City**

Ms. Lindell began working for the City in July 2000 and remained there for approximately eight years until her termination in April 2008.  (Lindell Decl. (Dkt. # 286) ¶¶ 3, 53.)  Ms. Lindell was originally hired as the City Attorney for Mercer Island but was promoted to Deputy City Manager in January 2007.  (*Id.* at ¶ 3.)  In both positions with the City, Ms. Lindell directly reported to the City Manager, Rich Conrad. When Ms. Lindell was promoted to Deputy City Manager, the City hired Bob Sterbank in April 2007 as Ms. Lindell's replacement.  (Mayer Decl. (Dkt. # 54) ¶¶ 3-4.)

After the incidents discussed below, Mr. Sterbank resigned from his position as City Attorney in February 2008.  (Lindell Decl., Ex. UU (Sterbank Separation Agreement).)  Ms. Lindell was terminated as Deputy City Manager in April 2008.  Mr. Sterbank was replaced by an internal candidate, Katie Knight, as City Attorney.  It is not clear from the record who replaced Ms. Lindell as Deputy Manager.

**B.      The Segle Matter and Sterbank Memo**

In June 2007, shortly after Mr. Sterbank became the City Attorney, Ms. Lindell commenced an investigation of certain male employees from the maintenance department

ORDER- 3

1   who were observed, while on duty for the City, watching a video of animals having sex.

2   (Lindell Decl. ¶ 27.)  While watching the video, the male employees were heard making

3   comments regarding the anatomy of the animals as well as the animals' enthusiasm.  (*Id.*)

4   One of the male employees watching the video was Johnny Segle, the husband of the

5   City's Human Resources Director, Kryss Segle.  (*Id.*)  At a subsequent meeting wherein

6   the male employees were being counseled on appropriate work place behavior, Mr. Segle

7   stated in front of the group, "What, no more boobies?"  (*Id.*)

8        As a result of Mr. Segle's conduct, Ms. Lindell – filling in as the Human Resource

9   Director for Ms. Segle, who was conflicted out of the proceedings as they involved her

10  husband – recommended that Mr. Segle receive a reminder notice and written reprimand

11  as a result of his participation in the video watching and his comment regarding "no more

12  boobies."  (*Id.*, Ex. P.)  According to Ms. Lindell, her recommendations regarding Mr.

13  Segle's discipline had a negative impact on Rich Conrad because of his close relationship

14  to Mr. Segle's wife.  (*Id.* ¶ 29.)

15       Kryss Segle was also upset with the recommended discipline of her husband so

16  she drafted a union grievance on his behalf and allegedly asked Mr. Conrad to intervene

17  in the matter.  (*Id.*, Ex. G.)  Ms. Segle also threatened to resign, which prompted Mr.

18  Conrad's offer to tear up the reprimand, "break all the rules," and try to resolve the

19  harassment issue informally.  (*Id.*, Exs. S-U (emails between Ms. Segle and Rich

20  Conrad).)  When Ms. Lindell learned of Mr. Conrad's plan to not follow the City's anti-

21  harassment policies, she spoke to Mr. Conrad and Mr. Sterbank about the City's potential

22  liability for not taking the issue seriously.  (*Id.* ¶ 31.)

1    Mr. Sterbank was concerned about Mr. Conrad's actions regarding the Segle

2 Matter and drafted a legal memorandum on October 3, 2007 ("the Sterbank Memo")

3 advising Mr. Conrad that the conduct at issue could expose the City to risk for tolerating

4 sexual harassment.  (*Id.* ¶ 31 & Ex. V.)  Mr. Sterbank also outlined the potential claims

5 for quid pro quo harassment or hostile work environment arising out of Mr. Conrad's

6 personal relationship with Ms. Segle.  (*Id.*)  The stated purpose of the Sterbank Memo

7 was to give Mr. Conrad "legal advice concerning the potential risks and consequences to

8 the City, and to him personally, arising from actions and proposed actions concerning a

9 discipline matter involving John Segle, the husband of Mercer Island Human Resources

10 Director Kryss Segle."  (Youssef Decl. (Dkt. # 277) Ex. ZZ at 1.)

11 **C.    The Reed Investigation**

12    Ultimately, the City decided to hire a neutral third-party to conduct an outside

13 investigation into the concerns raised in the Sterbank Memo.  (Mayer Decl. ¶ 12.)  The

14 City first hired outside counsel, Mike Bolasina, to act as the Special City Attorney in

15 coordinating the investigation because Mr. Sterbank, as the author of the memo, had a

16 conflict of interest and could not coordinate the investigation.  (*Id.*)  Mr. Bolasina, in turn,

17 hired Marcella Flemming Reed to conduct the investigation ("the Reed Investigation").

18 (Lindell Decl. ¶ 35.)

19    Ms. Reed conducted her investigation and presented her preliminary findings to

20 the City Council on December 3, 2007.  (Youssef Decl., Ex. EEE.)  Ms. Reed's findings

21 included concerns that Mr. Conrad and Ms. Segle had an emotionally intimate

22 relationship that Ms. Segle used to influence the decision to discipline her husband.  (*Id.*)

1  Ms. Reed also determined that Mr. Conrad's behavior could subject the City to claims for

2  gender discrimination, sexual harassment and/or hostile work environment.  (*Id.*)  Finally,

3  Ms. Reed warned that there were four employees that were at risk of being retaliated

4  against by Mr. Conrad, including Mr. Sterbank and Ms. Lindell.  (*Id.*)

5  **D.    Prior Rulings on Privilege**

6          Throughout this litigation, the City has taken the position that the documents

7  relating to the Reed Investigation and Ms. Reed's preliminary report are protected from

8  disclosure by the work product doctrine and the attorney-client privilege.  In a series of

9  orders issued in September 2010, however, the court ruled that neither privilege applied

10  to the Reed Investigation of the Segle Matter.  (*See* Orders at Dkt. ## 171, 173, 179, 182,

11  and 183.)  These orders represent the end result of the City's refusal to turn over

12  documents relating to the Reed Investigation, Ms. Lindell's motion to compel them, and

13  the court's ultimate *in camera* review of the documents.  (*See generally* Dkt. ## 171 –

14  183).  The court explains its rulings regarding each asserted privilege in turn below.

15          1.  <u>Work Product Doctrine</u>

16          In its September 23, 2010 order, the court held that the Reed Investigation was not

17  commenced in anticipation of litigation, and therefore could not be covered by the work

18  product doctrine.  (9/23/2010 Order (Dkt. # 179) (citing *Garcia v. City of El Centro*, 214

19  F.R.D. 587, 591 (S.D. Cal. 2003) (holding that a party asserting the work product

20  doctrine must show that the document was prepared in anticipation of litigation)).)  After

21  this order, the parties filed additional evidence supporting the court's finding regarding

22  privilege.  For example, James Pearman, one of the City's council members during the

1    Segle investigation, testified that it was his understanding that Ms. Reed's investigation

2    was based on a disciplinary issue regarding John and Kryss Segle's conflicts of interest.

3    (Youssef Decl., Ex. LL ("Pearman Dep.") at 185-86.)  Mr. Pearman did not believe the

4    investigation was being conducted as a result of pending or anticipated litigation.  (*Id.*)

5    Ronald Bryan Cairns, the City's mayor at the time of the investigation, also testified that

6    it was his understanding that the Reed Investigation was not conducted in anticipation of

7    any pending legal claims.  (Youssef Decl., Ex. OO ("Cairns Dep.") at 32.)

8        Mr. Conrad likewise testified that the Reed Investigation was not conducted in

9    light of pending litigation.  (*Id.*, Ex. MM ("Conrad Dep.") at 110.)  Mr. Conrad testified

10   that he wanted a "third-party investigatory process" that would get to the truth.  (*Id.* at

11   289.)  As he explained, "[a]fter the Sterbank memo . . . [he] was concerned that there

12   were these insinuations and sort of leaps in logic . . . no foundation and no basis, certainly

13   not facts to support it.  And [he] wanted to get to the bottom of it to clear my name . . . ."

14   (*Id.* at 288-89.)  Thus, given the additional evidence provided by the parties, the court

15   concludes that its preliminary assessment of the nature of the Reed Investigation was

16   correct.  It was not prepared in anticipation of litigation.

17       2.  <u>Attorney-Client Privilege</u>

18       As discussed above, an outside attorney, Mike Bolasina, was hired by the City for

19   the purpose of providing legal advice regarding statements contained in the Sterbank

20   Memo.  (Alexander Decl. (Dkt. # 282), Ex. I ("Bolasina Decl.") ¶ 4.)  Mr. Bolasina then

21   retained attorney Marcella Flemming Reed to provide "professional services" and entered

22   into an agreement with her stating that her work would be covered by the work product

1   doctrine.  (*Id.*)  Mr. Bolasina also sent an email to Ms. Reed on November 20, 2007,

2   stating "[a]ll went well with the city council.  They have formally and officially waived

3   the attorney-client privilege for communications involving Bob [Sterbank] on matters

4   arising from the Segle disciplinary matter."  (9/23/2010 Order, Ex. 1 ("the Waiver

5   Email").)  The City never informed Ms. Lindell or her counsel of the existence of the

6   Waiver Email.  The court discovered the email during its *in camera* review of the City's

7   privileged documents.

8         After the court raised the issue of the Waiver Email with the parties, the City did

9   not dispute the truth of the Waiver Email, but argued that it "executed a formal limited

10  waiver of privilege that allowed attorney-interviewees to speak candidly with Ms. Reed

11  without fear that they were disclosing privileged client confidences.  This waiver was

12  specifically intended *only* to allow the City's employees to discuss the [Sterbank]

13  Memo's allegations with Ms. Reed, acting in her capacity as outside counsel.  It was *not*

14  a blanket waiver of privilege regarding the events investigated – that is, it was not a

15  waiver as to anyone *other* than Ms. Reed."  (Bolasina Decl. (Dkt. # 36) ¶ 8.)  The court

16  was not persuaded by the City's argument regarding waiver and having reviewed

17  additional evidence, is satisfied that Ms. Reed was acting as an investigator and the City

18  waived any attorney-client privilege in order for Ms. Reed to conduct a full investigation.

19        Contrary to the City's pronouncement that Ms. Reed was acting as outside

20  counsel, Ms. Reed testified that she was hired by Special City Attorney, Mike Bolasina,

21  to "investigate" the Segle matter and that she entered into an agreement with the City as

22  an "investigator."  (Lindell Decl., Ex. BB ("Reed Decl.") ¶ 5.)  Second, there is no

1   doctrine of selective waiver that the court is aware of that would permit a waiver of

2   privilege as to *only* Ms. Reed.  Allowing such selective waivers would be fundamentally

3   unfair.  The attorney-client privilege and notions of waiver protect against the unfairness

4   that would result from a privilege holder selectively disclosing privileged

5   communications to an adversary, revealing those that support the cause while claiming

6   the shelter of the privilege to avoid disclosing those that are less favorable.  *See* 8 J.

7   Wigmore, Evidence § 2327 at 636 (McNaughton rev. 1961).  The Ninth Circuit teaches

8   that when dealing with intentional disclosures, the focal point of privilege waiver analysis

9   is the disclosure of the privileged communication to someone outside the attorney-client

10  relationship, not the reasoning behind the intent to waive the privilege.  *See, e.g.,*

11  *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996).

12      Here, the court found that the City waived its attorney-client privilege so that Ms.

13  Reed could investigate the claims made in the Sterbank Memo regarding the Segle

14  Matter.  The City, through Mr. Conrad, sought to clear Mr. Conrad's name through an

15  outside investigation.  When the Reed Investigation did not conclude in the manner Mr.

16  Conrad had anticipated, the City essentially withdrew its formal and official waiver of the

17  attorney-client privilege "for communications involving Bob [Sterbank] on matters

18  arising from the Segle disciplinary matter," and then failed to inform Ms. Lindell that the

19  waiver had ever occurred.

20      In its September 23, 2010 order, the court concluded that the City had waived the

21  attorney-client privilege relating to the subject matter of the Segle Matter, which

22  necessarily included the Sterbank Memo and the Reed Investigation notes and

preliminary report.  (*See generally* 9/23/2010 Order.)  The court ordered the City to produce the documents immediately.

**E.      Ms. Lindell's PRA Request**

Shortly after her termination, on May 6, 2008, Ms. Lindell sent an extensive and detailed PRA request for documents relating generally to (1) her termination of employment, (2) Rich Conrad, (3) the Reed Investigation, and (4) the Segle matter. (Alexander Decl. (Dkt. # 282), Ex. B.)  Ms. Lindell's request is very specific and detailed because Ms. Lindell was aware of the existence of many of the documents responsive to her request.  For example, Ms. Lindell had reviewed many of the controverted documents prior to her termination and had authored others.

The City initially responded timely to Ms. Lindell's PRA request on May 14, 2008, by requesting an additional 30 days to respond.  (Alexander Decl., Ex. C.)  The City requested another 30 days on June 24, 2008, and on August 6, 2008, the City informed Ms. Lindell that the documents were available for inspection.  (*Id.*, Exs. E & G.)  Then, on August 19, 2008, the City produced a log reflecting the documents it had determined were exempt from Ms. Lindell's request.  (Youssef Decl., Ex. H.)  The log failed to identify any documents with sufficient particularity to determine whether documents relating to the Segle Matter were being withheld.  (*Id.*)  Every single document on its first exemption log was labeled as being withheld on the basis of the attorney-client privilege.  (*Id.*)

The City provided a revised withholding log to Ms. Lindell in or around December 2008.  (Youssef Decl., Ex. N.)  The December log provided additional information as to

the nature of the documents withheld.  The City identified the Waiver Email for the first

time, by number only, in its December log as protected by both the attorney-client

privilege and the work product doctrine.  (*Id.* at 32.)  The December log also identifies

Mr. Sterbank's memo as protected by the "attorney-client privilege."  (*Id.* at 30).

Only after Ms. Lindell filed this lawsuit and sent discovery requests to the City

requesting many of the same documents identified in her PRA request, *and* filed a motion

to compel, did the City send Ms. Lindell a third revised privilege log on July 12, 2010.

(Youssef Decl., Ex. DD.)  This log similarly identifies the Sterbank Memo and the

Waiver Email as protected by the attorney-client privilege and the work product doctrine.

(*Id.*)

As discussed above, only after the court's *in camera* review of the documents and

its corresponding order to show cause regarding the Waiver Email, did Ms. Lindell learn

of the City's formal and official waiver of the privilege as to documents she had

requested over two years prior to the court's review.  After considering the City's

objections, the court granted Ms. Lindell's motion to compel the production of

documents relating to the Segle Matter, including the Sterbank Memo and the Reed

Investigation.  (9/23/10 Order at 4.)  Only after the court threatened to hold the City in

contempt of court did the City finally turn over the documents that were wrongfully

withheld from production in response to both Ms. Lindell's PRA request and her

discovery requests.  (*See* Dkt. ## 186, 190.)

1  **III.   ANALYSIS**

2       Summary judgment is appropriate if the evidence, when viewed in the light most

3  favorable to the non-moving party, demonstrates there is no genuine dispute of material

4  fact.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

5  *Washington Mut. Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  The moving party

6  bears the initial burden of showing there is no material factual dispute and that he or she

7  is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party

8  meets its burden, the nonmoving party must go beyond the pleadings and identify facts

9  which show a genuine dispute for trial.  *Cline v. Indus. Maint. Eng'g. & Contracting Co.*,

10  200 F.3d 1223, 1229 (9th Cir. 2000).

11       The summary judgment standard applies to claims for violations of the PRA.

12  *Sanders v. State*, 240 P.3d 120, 129 (Wash. 2010).  After finding a violation of the PRA,

13  however, the amount of the penalty is within the sole discretion of the judge and

14  deference to the nonmoving party is no longer required.  *Yousoufian v. Office of King*

15  *County Exec.*, 229 P.3d 735, 743 & 743 n.6 (Wash. 2010) ("*Yousoufian 2010*").[3]  Here, as

16  _____

17      [3] The procedural history for *Yousoufian v. Office of Ron Sims* or *Office of King County Exec.*, begins in September 2001 in the Washington Superior Court, 2001 WL 3618592 (Sept.

18  21, 2001).  In 2001, the Superior Court Judge awarded penalties to Mr. Yousoufian for the County Executive's Office's violation of the PRA (or Public Disclosure Act, as it was named in

19  2001).  The case was appealed to the Washington Court of Appeals, which affirmed in part and reversed in part.  60 P.3d 667 (Wash. Ct. App. 2003).  The Washington Supreme Court accepted

20  review and reversed in part and remanded the matter back to the Superior Court. 98 P.3d 463 (Wash. 2005) ("*Yousoufian 2005*").  The Superior Court imposed a greater penalty on remand

21  and the case was appealed to the Washington Court of Appeals, which again reversed and remanded.  151 P.3d 243 (Wash. App. 2007).  The Washington Supreme Court accepted review

22  and reversed in part and remanded the matter back to the Superior Court.  229 P.3d 735 (Wash. Ct. 2010) ("*Yousoufian 2010*").

ORDER- 12

1   discussed below, the court previously found that the City wrongfully withheld documents

2   on the basis of privilege relating to the Segle Matter, including those relating to the Reed

3   Investigation and the Sterbank Memo.

4   **A.      The Public Records Act**

5        The Washington Legislature explains the purpose of the PRA as:

6        The people of this state do not yield their sovereignty to the agencies that
     serve them.  The people, in delegating authority, do not give their public

7        servants the right to decide what is good for the people to know and what is
     not good for them to know.  The people insist on remaining informed so

8        that they may maintain control over the instruments that they have created.
     This chapter shall be liberally construed and its exemptions narrowly

9        construed to promote this public policy and to assure that the public interest
     will be fully protected.  In the event of conflict between the provisions of

10       this chapter and any other act, the provisions of this chapter shall govern.

11  RCW 42.56.030; *see also Spokane Research & Def. Fund v. City of Spokane*, 117 P.3d

12  1117, 1122 (Wash. 2005).

13       RCW 42.56.550(4) provides that a person who "prevails against an agency in any

14  action in the courts seeking the right to inspect or copy any public record or the right to

15  receive a response to a public record request within a reasonable amount of time shall be

16  awarded all costs, including reasonable attorney fees, incurred in connection with such

17  legal action.  In addition, it shall be within the discretion of the court to award such

18  person an amount not less than five dollars and not to exceed one hundred dollars for

19  each day that he or she was denied the right to inspect or copy said public record." *Id.*

20  After finding liability, the court determines the appropriate award by (1) determining the

21  amount of days the party was denied access, and (2) determining the appropriate per day

22

penalty depending on the agency's actions.  *Yousoufian v. Office of Ron Sims*, 98 P.3d

463, 438 (Wash. 2005) ("*Yousoufian 2005*").

### 1.  Liability For Violating the PRA

The City does not dispute that, given the court's rulings regarding privilege as to

the Segle Matter, the issue of liability for wrongful withholding under the PRA has

already been determined as adverse to it.  (Resp. (Dkt. # 280) at 15 (noting that a

withheld document that is not covered by one of the PRA exemptions is a nonexempt

document and the withholding of a nonexempt document is a "wrongful withholding"

that violates the PRA (citing RCW 42.56.290)).)  The sole question then before the court

on this issue is the amount of penalty that should be imposed for the violation.

Before turning to penalty, however, the court must consider whether there are

other categories of documents that were wrongfully withheld.  Necessary to this analysis,

is the court's initial determination as to whether there is in fact more than one category of

documents that were requested by Ms. Lindell.

### 2.  Groupings of Requests

Ms. Lindell claims that in her 2008 PRA request she asked for 14 different

categories of documents and she should be awarded a per day penalty for each category.

(Brunette Decl. (Dkt. # 274), Ex. A.)  The court addresses each alleged category of

documents separately below.

The court begins with Ms. Lindell's request for five specific documents, each of

which Ms. Lindell claims constitutes a separate category of documents.  Ms. Lindell's

specific document requests include: (1) the Sterbank Memo, (2) Mr. Conrad's response to

1  the Sterbank Memo, (3) Ms. Lindell's chronology, (4) Mr. Sterbank's chronology, and

2  (5) Mr. Conrad's chronology.  (*Id.*)  These documents do not constitute separate

3  categories of documents but rather can be grouped into the broader rubric of a request for

4  documents relating to the Reed Investigation of the Segle Matter.  In making this

5  determination, the court relies on the Washington Supreme Court's opinion in *Yousoufian*

6  *2005*.  In *Yousoufian 2005*, the Court held that the Public Disclosure Act, the former

7  PRA, does not require the court to assess a per day penalty for each requested document.

8  98 P.3d at 470.  The Court explained that "[a]lthough the PDA's purpose is to promote

9  access to public records, this purpose is better served by increasing the penalty based on

10  an agency's culpability than it is by basing the penalty on the size of the plaintiffs[sic]

11  request."  *Id.*

12       Also under the same rubric are Ms. Lindell's alleged categories of requests for

13  documents relating to the same subject matter but covering more than a single record.

14  These requests include: (1) the Reed Investigation, (2) investigation and discipline of

15  Johnny Segle, (3) notes relating to the City Council's investigation, (4) discipline of Mr.

16  Conrad, (5) discipline of Kriss Segle, and (6) documents relating to the City's nepotism

17  policy, including versions of the policy and correspondence relating to how the policy

18  applied to the Segles.  (*Id.*)  The court concludes that these alleged categories fall into the

19  same category as the single category discussed above relating to the Segle Matter.

20       Finally, there is one broad request that seeks all "correspondence between key

21  parties including Ms. Lindell, City Manager Conrad, HR Director Kryss Segle, and City

22  Attorney Katie Knight."  (*Id.*)  By using the term "key parties" the court presumes Ms.

1    Lindell sought correspondence relating to the events at issue and for whom these parties

2    were involved, *i.e.*, the Segle Matter, the Sterbank Memo and the Reed Investigation.

3    The court therefore finds that this request falls also falls under the single category of the

4    Segle Matter.

5         Having found that 12 requests can be grouped under the same subject matter, and

6    therefore constitute one category of documents, the court considers the remaining two

7    purported categories of documents: (1) documents relating to the Stephson Investigation,

8    an unrelated sexual harassment investigation of an employee's claims against Mr.

9    Conrad, and (2) Ms. Lindell's contacts and calendar from Microsoft Outlook.  Unlike the

10   documents identified above, the court did not make a finding as to whether the City

11   wrongfully withheld documents relating to Ms. Lindell's request for the Stephson

12   Investigation records or Ms. Lindell's request for her contacts and calendar records.  As

13   shown by Ms. Lindell, however, the City waited 882 days before turning over the

14   Stephson Investigation records and 842 days before turning over the contacts and

15   calendar.  A delay of access to nonexempt documents alone violates the PRA's

16   requirement that "[r]esponses to requests for public records shall be made promptly by

17   agencies."  RCW 42.56.520.  While there is nothing before the court indicating why the

18   documents were released well after Ms. Lindell's requests were made, the court presumes

19   that the City made its own determination that these records should have been produced in

20   response to the PRA request.  Unfortunately for the City, its determination that the

21   documents were responsive was over two years delinquent.

22

ORDER- 16

Accordingly, the court finds Ms. Lindell's PRA requests can be grouped into three categories: (1) records relating to the Reed Investigation of the Segle Matter; (2) records relating to the Stephson Investigation; and (3) Ms. Lindell's contacts and calendar from Microsoft Outlook.

### 3. Number of Days Access was Denied

The City contends, without argument or analysis, that Ms. Lindell's request was delayed 882 days.  (Resp. at 24.)  Ms. Lindell, on the other hand, provides a chart showing that the number of days the 14 alleged categories of documents were delayed was between 764 days and 937 days.  (Brunette Decl., Ex. A.)  Using Ms. Lindell's calculations, but applying them consistent with the court's findings regarding categories of documents, the number of days access was denied for each specific category is as follows: (1) the records relating to the Reed Investigation of the Segle Matter = average delay of 868 days; (2) the records relating to the Stephson Investigation = delay of 882 days; and (3) Ms. Lindell's contacts and calendar = delay of 842 days.  (*Id.*)  The court next considers the per day penalty for each category of documents.

### 4. Damages for Violating the PRA

The Washington Supreme Court recently set forth the factors for a court to consider before awarding statutory damages for violations of the PRA.  In *Yousoufian 2010*, the Court gave a list of both "aggravating" and "mitigating" factors for trial courts to consider before imposing a penalty under the PRA.  229 P.3d at 747.

The mitigating factors include: (1) a lack of clarity in the PRA request, (2) the agency's prompt response or legitimate follow-up inquiry for clarification, (3) the

agency's good faith, honest, timely, and strict compliance with all PRA procedural requirements and exceptions, (4) proper training and supervision of the agency's personnel, (5) the reasonableness of any explanation for noncompliance by the agency, (6) the helpfulness of the agency to the requestor, and (7) the existence of agency systems to track and retrieve public records. *Id.*

On the other hand, the aggravating factors include: (1) a delayed response by the agency, especially in circumstances making time of the essence, (2) lack of strict compliance by the agency with all the PRA procedural requirements and exceptions, (3) lack of proper training and supervision of the agency's personnel, (4) unreasonableness of any explanation for noncompliance by the agency, (5) negligent, reckless, wanton, bad faith, or intentional noncompliance with the PRA by the agency, (6) agency dishonesty, (7) the public importance of the issue to which the request is related, where the importance was foreseeable to the agency, (8) any actual personal economic loss to the requestor resulting from the agency's misconduct, where the loss was foreseeable to the agency, and (9) a penalty amount necessary to deter future misconduct by the agency considering the size of the agency and the facts of the case. *Id.* at 748.

Neither party addresses the latter two categories of documents, *i.e.*, Stephson Investigation and Ms. Lindell's contacts and calendar, with sufficient detail for the court to determine the applicable mitigating and aggravating factors.  The City argues that it was Ms. Lindell that originally took the position that the Stephson Investigation was privileged and that this is a mitigating factor in its favor.  (*See* Alexander Decl. (Dkt. # 282), Ex. HH.)  In 2005, Ms. Lindell, in her capacity as City Attorney, sent a letter to a

Mercer Island citizen regarding a 2005 PRA request for documents relating to the

Stephson Investigation.  In the letter she claims that the investigative report was protected

by both attorney-client privilege and work product doctrine.  (*Id.*)  Thus, the City claims

that it was acting in good faith with respect to the records relating to the Stephson

Investigation when it relied on Ms. Lindell's prior findings of privilege as to these

documents.  Nothing in the record, however, suggests that Ms. Lindell's privilege

analysis was incorrect.

Neither party offers an explanation of why the City turned over documents relating

to the Stephson Investigation.  Thus, viewing the facts in the light most favorable to the

City, the court finds that if the City's failure to turn over these documents was not an

egregious violation of the PRA.  Indeed, the City seems to have offered the records as a

conciliatory measure and not in recognition of a wrongful withholding.  Accordingly, the

court awards the lowest penalty permitted for withholding the Stephson Investigation

documents.

In her PRA request, Ms. Lindell specifically requested a copy of her "contacts

contained in Microsoft outlook and a copy of [her] calendar from September 1, 2007

through December 31, 2009."  (Alexander Decl., Ex. B.)  Ms. Lindell did not receive

these records until almost two and a half years later.  The City gives no explanation for its

delay and the court cannot discern any applicable exemption for failing to disclose these

records.  Accordingly, the court finds that the City wrongfully withheld these records

from Ms. Lindell.

1    Finding that three categories of damages are worthy of a penalty, the court turns to

2    the factors for determining the amount of the penalty.  In its response to Ms. Lindell's

3    request for maximum penalties, the City focuses solely on the mitigating factors set forth

4    in *Yousoufian 2010*.  (Resp. at 22-23.)  Thus, the City claims (1) Ms. Lindell's request

5    was too broad and too vague; (2) it repeatedly sought clarification from Ms. Lindell; (3) it

6    strictly complied with the PRA procedural requirements; (4) Ms. Lindell does not allege

7    that the staff was poorly trained; (5) every single document that was withheld was based

8    on a good faith interpretation of *Davis v. The City of Seattle*, C06-1659Z (Dkt. # 190)

9    (November 20, 2007), an unpublished opinion by a district judge in this court; (6) the

10   City went out of its way to make responsive documents available to Ms. Lindell; and (7)

11   Ms. Lindell does not allege that the City failed to properly track its records.  (*Id.* at 22-

12   23.)

13   While the court must accept as true the facts supporting the above factors, the

14   court does not find them persuasive in reaching its ultimate determination.  For example,

15   the court cannot comprehend how the City's continued communication with Ms. Lindell

16   regarding her PRA request, while at the same time failing to communicate regarding the

17   Waiver Email, is a mitigating factor.  One could assume that if the City was in

18   communication with Ms. Lindell regarding her PRA request, it would bring up the

19   Waiver Email and make its argument as to why it believed it was not operable instead of

20   failing to even disclose its existence.  Similarly, the court does not accept as a mitigating

21   factor that the City, as it claims, went out of its way to make what it determined to be

22   responsive documents available to Ms. Lindell, when the very question of what it deemed

1    to be responsive is the crux of its failure to disclose.  Finally, the court reviewed *Davis v.*

2    *The City of Seattle*, and is not persuaded that the case is in any way applicable to the

3    instant case.  The court in *Davis* was not confronted with a formal and official waiver of

4    the attorney-client privilege.  Nevertheless, because the court must view the evidence in

5    the light most favorable to the City, the court will consider the City's reliance on *Davis* as

6    a mitigating factor in making its determination on damages.

7            In contrast to the City, Ms. Lindell's argument focuses primarily on the

8    aggravating factors.  Ms. Lindell claims that her ability to find work as an attorney has

9    been hindered due to the City's failure to provide the documents related to Ms. Reed's

10   investigation that, in her opinion, exonerate her in some manner.  Ms. Lindell also claims

11   that she is unable to explain to future potential employers why she left the City after eight

12   years because the City threatened to file a bar complaint against her if she discusses the

13   facts surrounding the Reed Investigation.[4]  (Lindell Decl. ¶ 14.)  Moreover, she contends

14   that "[a]ny search of the court filings by a potential employer reveals that my former

15   employer accuses me of being 'deceitful and dishonest' and 'disclosing client

16   confidences.'"  (*Id.*)  Finally, Ms. Lindell claims that the City has made a number of

17

18   _____

19        [4] There is no dispute that the City threatened to file bar complaints against Ms. Lindell,
     and even filed counter-claims against her in this case, for disclosing what it considered to be
20   attorney-client confidences.  This fact makes the City's argument that it should not be penalized
     for withholding documents that Ms. Lindell already possessed even more offensive to the court.
21   Although Ms. Lindell may have had copies of the documents at issue, she was certainly not free
     to use them in defending herself against the charges filed by the City.  The City's attempt to use
22   these facts as a mitigating factor, without acknowledging its own culpability, is troubling to the
     court and belies the City's credibility.

ORDER- 21

1   attacks on her character and not having the Reed Investigation materials has made it

2   impossible for her to defend her reputation and good character.  (*Id.*)

3          The court is persuaded by Ms. Lindell's explanation of how the City's failure to

4   disclose documents relating to the Segle Matter and the Reed Investigation, which

5   ultimately lead to her termination, caused her personal economic loss.  The court is also

6   persuaded that the economic loss to Ms. Lindell loss was foreseeable by the City.

7   Finally, the court finds that the decision to withhold the documents relating to the Segle

8   Matter, in the face of the Waiver Email, constituted a negligent, reckless, wanton, or

9   intentional noncompliance with the PRA by the City.  *Yousoufian 2010*, 229 P.3d at 748.

10         Thus, having weighed the factors set forth by the Washington Supreme Court in

11  *Yousoufian 2010*, the court finds that an appropriate statutory penalty of $5 per day for

12  failing to produce the Stephson Investigation, $25 per day for failing to produce Ms.

13  Lindell's contacts and calendar, and $75 per day for failing to turn over the materials

14  relating to the Segle Matter, is appropriate.  Based on a calculation of 882 days for the

15  Stephson Investigation at $5 per day, 842 days for the contacts and calendar at $25 a day,

16  and 868 days for documents relating to the Segle Matter at $75 a day, the court awards

17  Ms. Lindell a total of $90,560 in penalties plus *reasonable* attorney's fees and costs.

18         The court warns Ms. Lindell's counsel in advance not to claim fees and costs

19  relating to Ms. Lindell's successful motion to compel, for which the court already

20  ordered compensation, as part of his PRA fee request.

21

22

## IV.   CONCLUSION

The court GRANTS Ms. Lindell's motion for partial summary judgment on her claim against the City for violating the PRA (Dkt. # 273) and awards her $90,560 in penalties plus reasonable attorney fees and costs.

Dated this 26th day of June, 2011.

_____
JAMES L. ROBART
United States District Judge

ORDER- 23